Andrew Erickson, Alaska Bar No. 1605049
Matt Mead, Alaska Bar No. 0711095
LANDYE BENNETT BLUMSTEIN LLP
701 West Eighth Avenue, Suite 1100
Anchorage, AK 99501
(907) 276-5152
andye@lbblawyers.com
mattm@lbblawyers.com

*Attorneys for Defendant Joseph Delia*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| MARIA M. GIVENS, as Personal Representative of the Estate of Raymond C. Givens, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JOSEPH DELIA, | ) | Case No. 3:23-cv-00121-HRH |
| Defendant. | ) ) | |
| _____ | ) | |

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
# AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................4

STATUTES PRINCIPALLY RELIED UPON.......................................................9

INTRODUCTION...............................................................................................10

STATEMENT OF UNDISPUTED FACTS..........................................................13

    I.     The Oenga Allotment and Lease Agreement..................................13

    II.    The Contingency Fee Contract........................................................16

    III.   *Oenga v. United States*.....................................................................18

    IV.   The Contingency Fee Contract First Amendment.........................19

    V.    The Fee/Cost Reduction Agreement...............................................21

LEGAL STANDARDS .......................................................................................24

ARGUMENT.......................................................................................................25

    I.     Illegal Contracts are unenforceable................................................25

    II.    The Contract violates Section 410...................................................28

         A.    The Contract was intended to "run with the land."..............30

         B.    Ray was not exempt from Section 410..................................33

    III.   Public policy reasons behind Section 410 support
         concluding that the Contract is illegal and unenforceable............40

    IV.   Ray's estate is not entitled to the remedy of
         quantum meruit because the Oenga heirs already paid
         Ray a reasonable amount of fees......................................................48

CONCLUSION ..........................................................................................52

CERTIFICATE OF COMPLIANCE...............................................................53

CERTIFICATE OF SERVICE..........................................................................53

# TABLE OF AUTHORITIES

**Federal Cases**

*Alaska v. Babbitt,*
    38 F.3d 1068 (9th Cir. 1994)......................................................................13

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,*
    421 U.S. 240 (1977)...............................................................................39

*Arenas v. Preston,*
    181 F.2d 62 (9th Cir. 1950)...............................................................*passim*

*Erickson v. Pfiester,*
    No. 1:21-cv-00009-JMK,
    2023 U.S. Dist. LEXIS 173363 (D. Alaska Sept. 27, 2023)......................26

*Erie R. Co. v. Tompkins,*
    304 U.S. 64 (1938).................................................................................24

*Hayes v. Eagle-Picher Industries, Inc.,*
    513 F.2d 892 (10th Cir. 1975).............................................................44, 45

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983)...............................................................................50

*Kaiser Steel Corp. v. Mullins,*
    455 U.S. 72 (1982).................................................................................26

*Martin v. Gov't Emps. Ins. Co.,*
    No. 3:12-cv-00060-RRB,
    2013 U.S. Dist. LEXIS 192171 (D. Alaska Feb. 6, 2013)..........................25

*McMullen v. Hoffman,*
    174 U.S. 639 (1899)...............................................................................26

*Oenga v. United States (Oenga I),*
    83 Fed. Cl. 594 (2008).....................................................................13, 14, 15

*Oenga v. United States (Oenga II),*
    91 Fed. Cl. 629 (2010)................................................................................19

*Oenga v. United States (Oenga III),*
    96 Fed. Cl. 479 (2010)................................................................................14

*Polar Envtl. Techs. Inc. v. Rus-Oleum Corp.*,
    No. 4:20-cv-00017-HRH,
    2022 U.S. Dist. LEXIS 139200 (D. Alaska Aug. 4, 2022)........................24

*Raymond James Trust, N.A. v. Husby*,
    No. 3:19-cv-0138-HRH,
    2019 U.S. Dist. LEXIS 88240 (D. Alaska May 23, 2019)........................48

*Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*,
    39 F.4th 1113 (9th Cir. 2022)....................................................................25

*Shtauber v. Gerson,*
    239 F. Supp. 3d 248 (D.D.C. 2017)...........................................................41

*Taylor v. Sturgell,*
    553 U.S. 880 (2008)..................................................................................40

*United States v. Equitable Trust Company of New York,*
    283 U.S. 738 (1931)..........................................................................*passim*

*Wroten v. USAA Gen. Indem. Co.*,
    535 F. Supp. 3d 880 (D. Alaska 2021).......................................................24

**Alaska Cases**

*Adkins v. Collens*,
    444 P.3d 187 (Alaska 2019)......................................................................50

*Alaska Sales & Serv. v. Millet*,
    735 P.2d 743 (Alaska 1987)................................................................48, 49

*Cooper v. Thompson,*
    353 P.3d 782 (Alaska 2015)......................................................................50

*Edwards v. Alaska Pulp Corp.,*
        920 P.2d 751 (Alaska 1996)......................................................................50

*Fairbanks N. Star Borough v. Tundra Tours, Inc.,*
        719 P.2d 1020 (Alaska 1986).................................................................49

*Flint Hills Res. Alaska, LLC v. Williams Alaska Petro., Inc.,*
        377 P.3d 959 (Alaska 2016)....................................................................32

*Handle Constr. Co. v. Norcon, Inc.,*
        264 P.3d 367 (Alaska 2011)....................................................................25

*Hemmen v. State,*
        710 P.2d 1001 (Alaska 1985).................................................................25

*In re Estate of Brandon,*
        902 P.2d 1299 (Alaska 1995).................................................................11

*K & K Recycling, Inc. v. Alaska Gold Co.,*
        80 P.3d 702 (Alaska 2003)......................................................................25

*Kelley v. Donohue (In re Estate of Katchatag),*
        907 P.2d 458 (Alaska 1995)....................................................................48

*Kenneth P. Jacobus, P.C. v. Kalenka,*
        464 P.3d 1231 (Alaska 2020).................................................................11

*Knaebel v. Heiner,*
        663 P.2d 551 (Alaska 1983)....................................................................32

*Krossa v. All Alaskan Seafoods, Inc.,*
        37 P.3d 411 (Alaska 2001)......................................................................49

*Law Offices of Vincent Vitale, P.C. v. Tabbytite,*
        942 P.2d 1141 (Alaska 1997)............................................................*passim*

*Leisnoi, Inc. v. Merdes & Merdes, P.C.,*
        307 P.3d 879 (Alaska 2013)..............................................................*passim*

*Givens v. Delia*                                     Case No. 3:23-cv-00121-HRH
Motion and Memorandum in Support of Summary Judgment      Page 6 of 53

*Matter of City of Nome*,
    780 P.2d 363 (Alaska 1989).......................................................................29

*Nordin Constr. v. City of Nome*,
    489 P.2d 455 (Alaska 1971).......................................................................49

*Owen Jones & Sons v. C.R. Lewis Co.*,
    497 P.2d 312 (Alaska 1972).......................................................................49

*Pavone v. Pavone*,
    860 P.2d 1228 (Alaska 1993)........................................................25, 26, 52

*Powers v. United Servs. Auto Ass'n*,
    6 P.3d 294 (Alaska 2000)...........................................................................40

*Romero v. Cox,*
    166 P.3d 4 (Alaska 2007)...........................................................................49

*Rusch v. Se. Alaska Reg'l Health Consortium*,
    563 P.3d 2 (Alaska 2025)...........................................................................50

*Wall v. Stinson*,
    983 P.2d 736 (Alaska 1999).......................................................................40

**Other Cases**

*Bovard v. Am. Horse Enters., Inc.*,
    201 Cal. App. 832, 247 Cal. Rptr. 340 (Cal. App. 1988)...........................28

*Cosmopolitan Fin. Corp. v. Runnels*,
    625 P.2d 390 (Haw. Ct. App. 1981)..........................................................26

*First-Citizens Bank & Trust Co. v. Harrison*,
    326 P.3d 808 (Wash. Ct. App. 2014).........................................................41

*Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*,
    746 S.E.2d 2d 568 (W.Va. 2013)...............................................................41

*Jordan v. O'Brien,*
    9 N.W.2d 146 (S.D. 1943)...............................................................40

*Pretty Paint v. Rocky Mtn. Reg'l Director,*
    38 IBIA 177 (2002).............................................................29, 40

**Statutes**

25 U.S.C. § 410.......................................................................*passim*

Act of May 17, 1906, Pub. L. No. 59-171, 34 Stat. 197.....................13

AS 8.08.230(a)..........................................................................47

AS 13.16.645.............................................................................31

**Court Rules**

Alaska R. Prof. Conduct 1.5.....................................................23, 46

Alaska R. Prof. Conduct 1.7...............................................42, 43, 46

Alaska R. Prof. Conduct 1.8...............................................32, 43, 44

Fed. R. Civ. P. 56(a)..............................................................10, 24

**Other Authorities**

25 C.F.R. §§ 115.601(b)-615.......................................................33

American Bar Association, Formal Ethics Opinion 11-458 (Aug. 4, 2011).....24

Charles W. Wolfram, Modern Legal Ethics (1986)...........................24

## STATUTES PRINCIPALLY RELIED UPON

25 U.S.C. § 410 provides:

No money accruing from any lease or sale of lands held in trust by the United States for any Indian shall become liable for the payment of any debt of, or claim against, such Indian contracted or arising during such trust period, or, in case of a minor, during his minority, except with the approval and consent of the Secretary of the Interior.

Defendant Joseph ("Joe") Delia respectfully moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 regarding Affirmative Defense 9.[1] Joe is entitled to summary judgment because the contingency fee contract, as amended (the "Contract"), that Plaintiff Maria M. Givens seeks to enforce violates 25 U.S.C. § 410. There are no genuine disputes as to any material facts, and Joe is entitled to judgment as a matter of law.

## INTRODUCTION

In 2003, when Joe and seven of his relatives (collectively, the "Oenga heirs") needed help advocating for their rights in a matter involving a lease of the family's Alaska Native allotment, they hired Raymond ("Ray") C. Givens to be their lawyer.[2] During the attorney-client relationship, Joe trusted Ray to provide professional services and counsel, and Joe believed that Ray should be compensated fairly. Between 2006 and 2021, the Oenga heirs paid Ray more than $7 million, and Joe personally paid Ray more than $1.7 million.[3]

However, Joe's trust in Ray ended once Joe learned how Ray had been treating the other Oenga heirs. While Ray was still their lawyer, he began a

---

[1]     Docket No. 7 at 11 ("The Contingency Fee Contract, as amended, cannot be enforced because it is illegal.").

[2]     After the substitution of Maria M. Givens as the plaintiff, the defendant and former plaintiff are referred to by their first names for ease of reference.

[3]     Declaration of Andrew Erickson at 7, ¶ 24; 8, ¶ 25.

campaign of threats and intimidation aimed at coercing the Oenga heirs into making significant payments totaling hundreds of thousands of dollars to him each year. Ray knew that the Oenga heirs were receiving substantial rent payments from their allotment lease and he became obsessed with their personal financial matters. Ray even hired a private investigator to track the whereabouts of one of the Oenga heirs who had questioned whether Ray was entitled to any more fees. After Ray had retired and was no longer licensed to practice law, he continued to hold himself out as representing the Oenga heirs, attempting to gain access to their confidential financial information for his own benefit.

Once their attorney-client relationship ended, Joe discovered that Ray had committed a host of ethical and legal violations throughout his representation of the Oenga heirs, including failing to disclose that he was not licensed to practice law in Alaska and the existence of serious, unresolved conflicts of interest.[4] Most importantly for the purposes of this motion, Joe learned that the U.S. Department of the Interior had never approved the Contract that Ray

---

[4]     Discovery in this case is ongoing. Joe reserves his legal and factual arguments that Ray's ethical breaches warrant complete dismissal of the claims. *See Kenneth P. Jacobus, P.C. v. Kalenka*, 464 P.3d 1231, 1240 (Alaska 2020) ("[O]nce a conflict of interest or other ethical violation has been established, the attorney is prohibited from collecting fees for his or her services." (quoting *In re Estate of Brandon*, 902 P.2d 1299, 1317 (Alaska 1995))).

claimed entitled him to 25% of the Oenga heirs' allotment lease proceeds every year through 2038.

This Court should conclude as a matter of law that the Contract is illegal and unenforceable because it violates 25 U.S.C. § 410. Section 410 provides that "[n]o money accruing from any lease or sale of lands held in trust by the United States for any Indian shall become liable for the payment of any debt of, or claim against, such Indian . . . *except with the approval and consent of the Secretary of the Interior.*"[5]

Here, the Contract violates Section 410 because it makes the Oenga heirs' allotment lease payments liable for Ray's attorney's fees. Ray drafted the Contract to ensure that the Oenga heirs would pay his fees directly from their lease rents each year, and Ray has insisted that the Oenga heirs' debt is a "lien," or an encumbrance, on the allotment itself that runs with the land.[6] There is no factual dispute that Interior never approved the Contract.

---

[5]     25 U.S.C. § 410 (emphasis added).

[6]     Exhibit A at 18-19 [Plaintiff's Motion for Prejudgment Writ of Attachment, Docket No. 121 at 18-19, *Givens v. Leroy Oenga, Jr.*, No. 3:21-cv-00008-HRH (D. Alaska June 11, 2024)] ("[Leroy Jr.'s] inheritance of his father's interest in the allotment was subject to the obligation to pay [Ray's] fee from annual rents as a *covenant running with the land.*" (emphasis added))].

In applying Alaska law, this Court should conclude that the Contract is illegal and unenforceable. Furthermore, Ray's estate is not entitled to any equitable relief because Joe has already paid a reasonable amount of fees.

## STATEMENT OF UNDISPUTED FACTS

The contested Contract in this case is a contingency fee agreement among Ray and the Oenga heirs, which arose in the context of a lease of an Alaska Native allotment. None of the material facts are disputed.

## I. The Oenga Allotment and Lease Agreement

In 1980, Joe's grandfather, Andrew Oenga—an Inupiat Alaska Native—received a forty-acre allotment on the North Slope near Prudhoe Bay.[7] Pursuant to the Alaska Native Allotment Act,[8] the United States reserved "[a]ll of the oil and gas in the land so allotted, and to it, or persons authorized by it, the right to prospect for, mine, and remove such deposits from the same."[9]

Because of the Oenga allotment's location "on a peninsula known as Heald Point that juts out into the Beaufort Sea," which was "strategically

---

[7]    *See Oenga v. United States (Oenga I)*, 83 Fed. Cl. 594, 598 (2008).

[8]    Act of May 17, 1906, Pub. L. No. 59-171, 34 Stat. 197. *See generally Alaska v. Babbitt*, 38 F.3d 1068, 1073 (9th Cir. 1994) ("Once such an allotment is vested and the occupant gains equitable title to it, the United States' legal title is held in trust for the occupant.").

[9]    *Oenga I*, 83 Fed. Cl. at 598.

located for directional drilling into state oil and gas leases," it was a uniquely valuable piece of land.[10] In 1989, Andrew Oenga and BP Exploration (Alaska) ("BP") entered into a lease agreement granting BP the rights to operate oil and gas development and production facilities on the allotment through 2014 with the option of extending for a subsequent 25-year term (the "Lease Agreement").[11] The Lease Agreement was approved by the Bureau of Indian Affairs ("BIA") "under 25 U.S.C. § 415(a) and the implementing regulations in 25 C.F.R. Part 162."[12]

As the Court of Federal Claims explained in a case involving the Oenga allotment, "[t]he lease provided for an annual payment of $1,600 per acre ($16,000 per year for the initial ten-acre area) for each of the first five years, plus a $25,000 signing bonus."[13] "The rental rate could be 'increased at successive five-year intervals beginning in the sixth year after rental payments have begun[,] . . . based upon either the fair market undeveloped rental value for the property established by a [BIA] appraisal . . . or . . . based on the application of

---

[10]    *Oenga v. United States (Oenga III)*, 96 Fed. Cl. 479, 482 (2010).

[11]    *Id*.

[12]    *Id*.

[13]    *Oenga I*, 83 Fed. Cl. at 600.

a 'Cost Adjustment Factor'; which ever [sic] is greater.' "[14] "The Cost Adjustment Factor was calculated using the change in the Consumer Price Index ('CPI') from the CPI at the time of the prior rental adjustment (or, for the first reappraisal, the CPI at the time the lease was executed)."[15] In 1994, the Lease Agreement was amended to increase the annual rent to $80,640 and "provide for rental adjustments every four years instead of every five years."[16] "The annual rent for the period beginning in 1998 was set at $88,997.34,"[17] and the next rental adjustment period was scheduled for 2002–2006.

Under the Lease Agreement, BP's annual rent was paid directly to the BIA to hold in trust for Andrew Oenga, and subsequently his heirs, who inherited various percentages of the allotment.[18] However, by early 2003, the Oenga heirs began questioning whether they were receiving the proper amounts of rent payments. They sought out a lawyer for help.[19]

---

[14]    *Id.* at 600-01 (emphasis omitted; alterations in original).

[15]    *Id.* at 601.

[16]    *Id.* at 603.

[17]    *Id.* at 605.

[18]    *See* Docket No. 30-1 (SEALED) (Oenga family tree showing percentage ownership of the allotment).

[19]    Exhibit B at 3 (filed under seal) [Excerpts of Transcript, Testimony of Raymond C. Givens, Alaska Bar Association Fee Arbitration, *Leroy Oenga Jr. v. Raymond C. Givens*, No. 2021-F012 (Nov. 12, 2022)].

## II. The Contingency Fee Contract

Enter Ray Givens. In 2003, Ray was desperately searching for work on Indian law issues.[20] Although he was only licensed to practice law in Idaho and Washington,[21] he sent a brochure advertising his law practice (the "Givens Law Firm") to every federally-recognized Indian tribe in the country, including in Alaska.[22] One of his brochures was received by the Inupiat Community of the Arctic Slope ("ICAS")—a federally recognized Alaska tribal government— which was engaged in realty work on behalf of the BIA on the North Slope. ICAS put the Oenga heirs in touch with Ray.[23]

In October 2003, Ray and the Oenga heirs entered into the Contract, providing for attorney's fees on a contingent basis.[24] The Contract provided that Ray would represent the Oenga heirs in matters regarding "claims or causes of action arising out of" the Lease Agreement "and do all things

---

[20]    *See* Exhibit B at 2.

[21]    Exhibit C at 1 ("I was not and am not a member of the Alaska Bar Association. I was admitted to practice law in Washington State and Idaho when I represented the Oenga heirs.") [Declaration of Raymond C. Givens, Docket No. 21, *Givens v. Oenga Jr.*, No. 3:21-cv-00008-HRH (D. Alaska May 21, 2021)].

[22]    Exhibit B at 2.

[23]    Exhibit B at 3.

[24]    Exhibit D at 1 [Contingency Fee Contract].

*Givens v. Delia*                                        Case No. 3:23-cv-00121-HRH
Motion and Memorandum in Support of Summary Judgment        Page 16 of 53

necessary, appropriate, or advisable, in regard thereto."[25] Ray would be compensated by a percentage of the heirs' "Gross Recovery," which included back payments received under the Lease Agreement, increased lease payments under the Lease Agreement, damages, proceeds from any sale of the allotment, judgment or settlement amounts, and any increase resulting from the BIA's decision to use an ongoing appraisal to establish the lease rent going forward.[26]

The Contract provided that Ray would receive 30% of the Gross Recovery received in a settlement without an action having been filed in any court; 33.33% recovered through arbitration or settlement after filing an action in court but before trial; 35% recovered through arbitration, settlement, or judgment after trial; or 40% recovered through settlement upon appeal. The Contract also provided that "said sums payable to [Ray] for professional services are to be a *lien* upon any sums received in settlement or payment of any said claim, or upon any judgment recovered."[27] Ray did not seek Interior's approval

---

[25]     Exhibit D at 1.

[26]     Exhibit D at 1-2.

[27]     Exhibit D at 1 (emphasis added).

of the Contract, despite its provisions making allotment lease proceeds liable for the payment of his attorney's fees.[28]

## III.  *Oenga v. United States*

In June 2006, Ray filed a lawsuit on behalf of the Oenga heirs against the United States in the Court of Federal Claims seeking damages for breach of trust, and declaratory and injunctive relief related to the Lease Agreement.[29] The complaint alleged that the "United States has breached its fiduciary obligation and trust responsibility to the [Oenga heirs] by failing to collect and pay to the [heirs] an amount to be determined by the Court in the range of $27,265,943 (2.5% royalty) to $45,927,280 (4.167% royalty), less the amount collected ($670,191) plus interest at 18% per annum."[30] BP and other oil companies intervened in the case as defendants.

On February 12, 2010, the Court of Federal Claims determined that the United States breached its trust duties to the Oenga heirs by failing to monitor

---

[28]   Docket No. 36 at 18-19 ("[Ray] did not first seek the United States' approval of his fee contract with [the] Oenga heirs because he believed the government likely would not approve it or would insist on terms that would dissuade [Ray] from taking the case in the first place.").

[29]   *See* Complaint, *Oenga v. United States*, No. 1:06-cv-00491-NBF (Fed. Cl. June 30, 2006).

[30]   *Id.*

*Givens v. Delia*                                      Case No. 3:23-cv-00121-HRH
Motion and Memorandum in Support of Summary Judgment      Page 18 of 53

BP's compliance with the Lease Agreement beginning in 2001.[31] The court also concluded that the Oenga heirs were entitled to a judgment in an amount equal to the damages that the United States would have been entitled to recover from BP for the trespass in 2001 plus damages from BP's continued unauthorized use of the allotment.[32] Following an eight-day trial on the damages amount, the court entered final judgment in favor of the Oenga heirs for $4,924,000; however, the United States, oil company intervenors, and the Oenga heirs each appealed the damages award.

## IV.    The Contingency Fee Contract First Amendment

While the appeal in *Oenga v. United States* was pending, the parties pursued settlement negotiations and held a mediation in Fairbanks in June 2011. The mediation resulted in a preliminary settlement framework outlined in a "Confidential Term Sheet" that Ray signed on June 23, 2011.[33] Under the settlement framework, the Oenga heirs would receive a $13.5 million lump sum payment[34] and the Lease Agreement would be replaced by a new lease with

---

[31]    *Oenga v. United States (Oenga II)*, 91 Fed. Cl. 629, 650 (2010).

[32]    *Id.*

[33]    *See* Exhibit E at 3 [Order on Motion for Reconsideration, Docket No. 54, *Givens v. Oenga Jr.*, No. 3:21-cv-00008-HRH (D. Alaska Sept. 24, 2021)].

[34]    Exhibit F at 1 [Contingency Fee Contract First Amendment].

*Givens v. Delia*                                        Case No. 3:23-cv-00121-HRH
Motion and Memorandum in Support of Summary Judgment    Page 19 of 53

rent "starting at $650,000/yr and increasing annually on a CPI-based cost of living adjustment."[35]

On August 5, 2011, at a meeting in Fairbanks, Ray demanded that the Oenga heirs sign an amendment to the Contract. The "Contingency Fee Contract First Amendment" modified the Contract to provide that the Oenga heirs would pay Ray "35% of the $13.5 million Lump Sum Settlement Amount paid under the Settlement Agreement" and "25% of annual rental" on the allotment "for both the 2012-2013 inclusive period and for the extended term period of 2014–2038 inclusive."[36] Thus, under the amended Contract, Ray's fees included future lease proceeds and would be paid directly to Ray:

> [The Oenga heirs] shall direct that these payments for professional services shall be paid directly to [Ray] by Lessee BP Exploration (Alaska), Inc. and/or the United States or any subdivision thereof from the funds due [the Oenga heirs] at the same time the remaining funds due are paid . . . .[37]

Ray explained that the amendment was necessary because the original Contract was ambiguous and too complex, and it was unclear what part of the

---

[35]    Exhibit F at 1.

[36]    Exhibit F at 1.

[37]    Exhibit F at 2.

settlement he would receive.[38] Ray never advised the Oenga heirs that the amendment significantly changed the payments that they would make to Ray each year,[39] or that they could seek independent legal advice before they signed the contract amendment.[40] Ray also did not seek Interior's approval of the Contingency Fee Contract First Amendment.[41]

## V. The Fee/Cost Reduction Agreement

On May 24, 2012, at a meeting in Fairbanks with Ray, the Oenga heirs signed a global settlement agreement with the United States and the oil companies.[42] The "Settlement Agreement and Release of All Claims" provided that

---

[38]     Exhibit F at 1.

[39]     *Compare* Exhibit D at 1-2 (excluding annual CPI adjustments from calculation of Ray's fees), *with* Exhibit F at 1-2 (including annual CPI adjustments in calculation of Ray's fees).

[40]     Exhibit G at 2-3 (filed under seal) [Deposition of Raymond C. Givens, Alaska Bar Association Fee Arbitration, *Leroy Oenga Jr. v. Raymond C. Givens*, No. 2021-F-012 (Oct. 12, 2022)]:

> Q: And at any point in time did you ever verbally tell the Oengas that if they wanted to dispute or seek any kind of independent counsel with regard to any amendment to the contingency fee contract, that they may do so?

> Ray: I have no recollection of that conversation such as that ever— ever occurring.

[41]     Docket No. 36 at 18-19.

[42]     *See* Exhibit E at 4; Exhibit H (filed under seal) [Settlement Agreement and Release of All Claims].

the United States and the oil companies would pay the Oenga heirs the agreed-upon $13.5 million lump sum in exchange for dismissal of all appeals and actions regarding the allotment.[43] The BIA would distribute the settlement payments to the Oenga heirs in proportion to their respective ownership interests in the allotment through their Individual Indian Money ("IIM") accounts.[44] With the BIA's approval, the Oenga heirs also executed a replacement lease for the allotment ("the 2012 Lease Agreement").[45]

At the same time that the Oenga heirs signed the Settlement Agreement and 2012 Lease Agreement, Ray demanded that the Oenga heirs sign a second amendment to the Contract. The "Fee/Cost Reduction Agreement" revised the Contract's method for reimbursing Ray's litigation costs.[46] Because the Contract did not specify whether costs would be deducted before or after calculating Ray's contingent fee, Ray explained that the "Fee First Approach," which he had been using, "has been questioned by the [BIA], suggesting that the costs

---

[43]    Exhibit J at 1 [Fee/Cost Reduction Agreement].

[44]    Exhibit H at 19.

[45]    *See* Exhibit I (filed under seal) [2012 Lease Agreement].

[46]    Exhibit J at 2.

should be reimbursed before the fee is paid [Cost First Approach]."[47] Thus, the Fee/Cost Reduction Agreement stated that "despite the provisions of the Contingency Fee Contract as amended to the contrary" reimbursement of Ray's $444,465 in litigation costs would be deducted from the $13.5 million lump sum payment before calculating Ray's attorney's fees (resulting in Ray claiming $4,569,437 in attorney's fees from the lump sum payment).[48] Finally, the Fee/Cost Reduction Agreement reiterated that "the contingency fee due on future rents, which was specifically provided for in both the original Contingency Fee Contract and the First Amendment thereof, remains due each year as a 25% fee of the total rent received each year."[49] Ray never advised the Oenga heirs that they could seek independent legal advice before they signed the

---

[47]     Exhibit J at 1; *see also* Exhibit K at 6 [Letter from Eugene R. Virden, Regional Director, BIA Alaska Region, to Raymond C. Givens (Dec. 9, 2011)] ("The current Contingency Fee Agreement does not appear to comply with Model Rule of Professional Conduct 1.5(c) because it does not clearly state 'whether [litigation and other expenses] are to be deducted before or after the contingent fee is calculated.' ").

[48]     Exhibit J at 2.

[49]     Exhibit J at 2.

*Givens v. Delia*                                                    Case No. 3:23-cv-00121-HRH
Motion and Memorandum in Support of Summary Judgment        Page 23 of 53

second contract amendment.[50] Ray also did not seek Interior's approval of the Fee/Cost Reduction Agreement.[51]

## LEGAL STANDARDS

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on their claims or defenses or any parts thereof.[52] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[53]

In this diversity jurisdiction case, "the Court applies federal procedural law and Alaska substantive law."[54] "Under Alaska law, the interpretation of a

---

[50]    Exhibit G at 2-3. *But see* American Bar Association, Formal Ethics Opinion 11-458 (Aug. 4, 2011) ("The courts are generally in accord that once the initial contract has been formed and the fiduciary relationship of client and lawyer has begun, any change in the contract will be regarded with great suspicion." (quoting Charles W. Wolfram, Modern Legal Ethics § 9.2.1 at 503 (1986))).

[51]    Docket No. 36 at 19.

[52]    *Polar Envtl. Techs. Inc. v. Rus-Oleum Corp.*, No. 4:20-cv-00017-HRH, 2022 U.S. Dist. LEXIS 139200 at * 9 (D. Alaska Aug. 4, 2022).

[53]    Fed. R. Civ. P. 56(a).

[54]    *Wroten v. USAA Gen. Indem. Co.*, 535 F. Supp. 3d 880, 883 (D. Alaska 2021) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

contract is a question of law."[55] When there is no controlling Alaska Supreme Court decision, this Court looks to case law, statutes, treatises, and restatements as guidance to decide how the Alaska Supreme Court would rule on the legal question presented.[56]

## ARGUMENT

### I. Illegal contracts are unenforceable.

It is blackletter law that courts "have no power, either in law or in equity, to enforce an agreement which directly contravenes a legislative enactment."[57] "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce

---

[55] *Martin v. Gov't Emps. Ins. Co.*, No. 3:12-cv-00060-RRB, 2013 U.S. Dist. LEXIS 192171 at * 7 (D. Alaska Feb. 6, 2013) (citing *Handle Constr. Co. v. Norcon, Inc.*, 264 P.3d 367, 370 (Alaska 2011) and *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 711-12 (Alaska 2003)).

[56] *See Ross Dress for Less, Inc. v. Makarios-Oregon, LLC*, 39 F.4th 1113, 1118 (9th Cir. 2022).

[57] *Pavone v. Pavone*, 860 P.2d 1228, 1231 (Alaska 1993) (citing *Hemmen v. State*, 710 P.2d 1001, 1003 (Alaska 1985)).

it . . . ."[58] "Generally, courts leave parties to an illegal bargain where they find them and will grant no remedy to either party."[59]

Under Alaska law, "courts may have an independent obligation not to enforce contracts that are contrary to statute or illegal on public policy grounds."[60] If there is legislation specifically prohibiting enforcement of a contractual term, "then the disputed term will always be unenforceable."[61]

For example, in *Leisnoi, Inc. v. Merdes & Merdes, P.C.*, the Alaska Supreme Court refused to enforce a contingency fee agreement between a lawyer and client because the agreement violated federal law.[62] The client, an Alaska Native corporation, promised to grant the lawyer a 30% interest in the corporation's Alaska Native Claims Settlement Act ("ANCSA") lands if the corporation prevailed in litigation handled by the lawyer.[63] But when the corporation

---

[58] *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (quoting *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899)).

[59] *Erickson v. Pfiester*, No. 1:21-cv-00009-JMK, 2023 U.S. Dist. LEXIS 173363 at * 10 (D. Alaska Sept. 27, 2023) (quoting *Pavone* 860 P.2d at 1231 (citing *Cosmopolitan Fin. Corp. v. Runne*ls, 625 P.2d 390, 397 (Haw. Ct. App. 1981))).

[60] *Leisnoi, Inc. v. Merdes & Merdes*, *P.C.*, 307 P.3d 879, 888 (Alaska 2013).

[61] *Pavone*, 860 P.2d at 1231.

[62] 307 P.3d at 887-89.

[63] *Id*. at 881.

prevailed, it refused to convey the interest in its lands and commenced fee arbitration under the Alaska Bar Rules.[64]

In *Leisnoi*, the Bar Association arbitration panel enforced the contingency fee agreement by requiring the corporation to pay the lawyer an amount equal to 30% of the value of the corporation's ANCSA lands as a money judgment.[65] The superior court confirmed the arbitration award and the corporation began making payments to the lawyer.[66]

More than 14 years later, when the corporation stopped making payments, the lawyer moved for a writ of execution to collect the judgment.[67] In opposing the writ, the corporation asserted (for the first time) that the contingency fee agreement violated Section 22(a) of ANCSA, which prohibits Alaska Native corporations from entering into contracts "based on a percentage fee of the value of all or some portion of the settlement granted by [ANCSA]."[68] However, the superior court issued the writ, ruling that the corporation's arguments were not raised within a reasonable time after the judgment.[69]

---

[64] *Id*. at 882-83.

[65] *Id*. at 883.

[66] *Id*.

[67] *See id*. at 884.

[68] *Id*. at 887.

[69] *See id*. at 893.

On appeal, the Alaska Supreme Court reversed, concluding that the contingency fee agreement clearly violated ANCSA and was therefore unenforceable.[70] The Court determined that the corporation was not barred from raising an illegality defense for the first time in post-judgment proceedings because the arbitration award and superior court judgment enforcing the contract were themselves illegal and no writ of execution could be granted.[71] "Whenever a court becomes aware that a contract is illegal, it has a duty to refrain from entering an action to enforce the contract."[72] Thus, *Leisnoi* stands for the proposition that a contingency fee agreement that violates a provision of federal law cannot be enforced in the courts, even if the parties' past performance indicates acceptance of the agreement's terms.

## II.    The Contract violates Section 410.

As the United States explained in its amicus brief in this case, "Congress has limited how leasing income derived from Indian lands, including the

---

[70]    *Id*. at 887 ("[I]t is clear that the original agreement between Merdes and Leisnoi violated the statute: It was based on a percentage fee of the value of Leisnoi's ANCSA lands.").

[71]    *Id*. at 887-89.

[72]    *Id*. at 888 n.27 (quoting *Bovard v. Am. Horse Enters., Inc.*, 247 Cal. Rptr. 340, 343 (Cal. App. 1988)).

[Oenga] Allotment, can be used to satisfy debts or claims by creditors."[73] Section 410 provides in full:

> No money accruing from any lease or sale of lands held in trust by the United States for any Indian shall become liable for the payment of any debt of, or claim against, such Indian contracted or arising during such trust period, or, in case of a minor, during his minority, except with the approval and consent of the Secretary of the Interior.[74]

Section 410 "establishes the general rule that funds derived from trust property are not available for the payment of debts of, or claims against, the account holder."[75] Because Section 410 is a federal statute designed to protect Indians from creditors, its provisions "should be construed broadly" and "ambiguities must be resolved in favor of the Indians."[76]

Importantly, the Alaska Supreme Court has interpreted Section 410 to prohibit lawyers from claiming funds derived from Native allotments to satisfy debts owed by their clients.[77] In *Law Offices of Vincent Vitale, P.C. v. Tabbytite*,

---

[73]    Docket No. 64 at 9.

[74]    25 U.S.C. § 410.

[75]    *Pretty Paint v. Rocky Mtn. Reg'l Director*, 38 IBIA 177, 179 (2002).

[76]    *Law Offices of Vincent Vitale, P.C. v. Tabbytite*, 942 P.2d 1141, 1147 (Alaska 1997) (quoting *In re City of Nome*, 780 P.2d 363, 367 (Alaska 1989)).

[77]    *Id*. at 1144. (Section 410 "insulates from the reach of creditors proceeds from the sale or lease of Indian allotment lands.").

a lawyer agreed to represent an Alaska Native allottee in litigation involving condemnation of the allotment.[78] After the condemnation was upheld by the courts the lawyer filed a lien on the condemnation proceeds as payment for his fees. On appeal, the Alaska Supreme Court concluded that Section 410 prohibited the lawyer's lien because "all of the proceeds from the condemnation action reasonably can be considered to have accrued from the lease or sale of allotment lands. The proceeds thus fall within the protection of section 410."[79] The Court emphasized that "Section 410 is designed to exempt certain Indian property from liability for the payment of certain debts" and courts are not free to disregard "the explicit command of the statute."[80]

## A.   The Contract was intended to "run with the land."

Applying the rule from *Tabbytite* to the facts here, this Court should conclude that the Contract violates Section 410 because it obligates money accruing specifically from the allotment lease for the payment of Ray's fees. The Contract provides that the Oenga heirs will pay "25% of annual rental" from the allotment lease to Ray, and specifically, that the Oenga heirs will "direct

---

[78]    *Id*. at 1145.

[79]    *Id*. at 1148.

[80]    *Id*. at 1147-48 (declining to apply *Arenas v. Preston*, 181 F.2d 62 (9th Cir. 1950) because "Section 410 is neither mentioned nor discussed in the *Arenas* opinion").

that these payments for professional services shall be paid directly" to Ray from the lease proceeds.[81]

Ray was exceedingly clear that the Contract was intended to create a "lien"[82] on the allotment's lease proceeds constituting a "covenant running with the land."[83] Ray drafted the Contract so that the allotment lease proceeds were liable for the debt that the Oenga heirs owed, and that debt would be passed on to future allotees as a "lien" on the allotment.[84] For example, in the related case of *Givens v. Leroy Oenga Jr.*,[85] Ray's estate is currently attempting to enforce the same Contract against Leroy Oenga Jr., who inherited his interest in the allotment from one of the Oenga heirs in 2012. Although Leroy Jr. never signed the Contract,[86] the premise of Ray's claim is that Leroy Jr.'s "inherited

---

[81]    Exhibit F at 1-2.

[82]    Exhibit D at 1.

[83]    Exhibit A at 19.

[84]    *Compare Tabbytite*, 942 P.2d at 1148 (allotment "lease proceeds thus fall within the protection of Section 410"), *with* Exhibit F at 1 ("Clients agree to pay attorney for professional services . . . 25% of annual rental on Alaska Native Allotment F-14632.").

[85]    No. 3:21-cv-00008-HRH (D. Alaska).

[86]    Exhibit L at 6-7 [Complaint, Docket No. 1, *Givens v. Leroy Oenga Jr.*, No. 3:21-cv-00008-HRH (D. Alaska Jan. 19, 2021)]. Joe also inherited a percentage of his interest in the allotment after the Contract was first executed. Joe reserves his arguments that Ray's claims to lease proceeds from the allotment interest that Joe inherited from his brother in 2013 are barred by AS 13.16.645.

interest in the Allotment was subject to [Ray's] right, pursuant to the Contingency Fee Contract, as amended, to be paid 25% of [Leroy Jr.'s] share of annual rents from the Allotment."[87] Thus, "the interest in the allotment inherited by [Leroy Jr.] was impressed by the contingency fee contract," which was a "covenant running with the land."[88] "[T]he contingency fee contract included an implied-in-fact covenant that [Ray's] fee would be paid from annual rents through 2036 [*sic*], even if a signatory to the contract died before then."[89]

Similarly, Ray's complaint in this case was premised on enforcing an equitable claim for specific performance against Joe.[90] Ray admitted that his fee is based on a percentage of the rent received from the allotment,[91] in other

---

[87]  Exhibit L at 6.

[88]  Exhibit A at 18-19. "[Ray's] claim against [Leroy Jr.] is based on the legally imposed duty that he inherited his father's interest in the allotment subject to the obligation to pay [Ray] through 2036 [*sic*]." Exhibit A at 11.

[89]  Exhibit A at 20. *But see* Alaska R. Prof. Conduct 1.8(a) ("A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless: . . . (2) the lawyer advises the client in writing to seek independent legal advice on the transaction and gives the client a reasonable opportunity to do so; and (3) the client gives informed consent, in a writing . . . .").

[90]  Docket No. 1 at 11; *but see Flint Hills Res. Alaska, LLC v. Williams Alaska Petro., Inc.*, 377 P.3d 959, 973 n. 45 (Alaska 2016) ("One who seeks the interposition of equity must generally show that he either has no remedy at law or that no legal remedy is adequate." (quoting *Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983))).

[91]  Docket No. 1 at 2-3.

words, the "money accruing from" the allotment lease.[92]  Thus, because Ray is

actually seeking to enforce a "lien" on the allotment lease proceeds, the Con-

tract violates Section 410.[93]

### B.    Ray was not exempt from Section 410.

There is no factual dispute that Interior never approved the Contract.[94]

Ray admitted he did not seek Interior's approval of the Contract "because he

believed the government likely would not approve it or would insist on terms

that would dissuade [Ray] from taking the case in the first place."[95] However,

---

[92]    25 U.S.C. § 410.

[93]    *See Tabbytite*, 942 P.2d at 1148 (holding attorney's lien on allotment pro-
ceeds was barred by Section 410).

[94]    The United States has already refuted Ray's erroneous contentions that
the Contract was approved implicitly either as part of the Settlement Agree-
ment or by the BIA as part of a distribution plan for one of the Oenga heirs.
Exhibit M at 8 [United States' Supplemental Brief, Docket No. 69 at 8, *Givens
v. Wallace Oenga*, No. 3:19-cv-00043-HRH (D. Alaska Mar. 19, 2020)] ("The
confidential terms sheet recognized that an agreement existed between [Ray]
and the Oenga heirs regarding attorney's fees, but the United States *did not
approve the agreement* between the two parties." (emphasis added)); Exhibit M
at 9 ("BIA approved payment of the fees in the disbursement plan for the mi-
nor's account, *but it did not purport to broadly approve the agreement* between
the Oenga heirs and" Ray (emphasis added)); Exhibit M at 10 ("BIA *denied*
[Ray's] request for automatic payments for the Oenga heirs' [individual Indian
money] accounts." (emphasis added)). The BIA has promulgated regulations
establishing procedures for requesting approval of certain contracts encumber-
ing trust property, including allotment proceeds. *See* 25 C.F.R. §§ 115.601(b)-
615. It is undisputed that Ray never followed those procedures.

[95]    Docket No. 36 at 18-19.

*Givens v. Delia*                                    Case No. 3:23-cv-00121-HRH
Motion and Memorandum in Support of Summary Judgment     Page 33 of 53

there is nothing in federal law, or Alaska law, that exempted Ray, or this Contract, from Section 410.

Ray's arguments in support of enforcing the Contract despite its lack of Interior's approval have relied on his strained interpretation of three cases, all of which are distinguishable from this litigation. First, in *Arenas v. Preston*, an Indian sued the United States under the General Allotment Act of 1894 to determine his rights to an allotment in California.[96] After the Indian prevailed in the litigation, the federal district court awarded him "attorney[']s fees and expenses and secur[ed] the payment thereof by the impression of a lien upon the land inuring to his benefit as a result of the litigation."[97] The United States appealed, arguing that the district court lacked jurisdiction and statutory authority to impose a lien on the allotment.[98]

The Ninth Circuit affirmed the attorney's fees lien, in part, concluding that federal courts have "equitable jurisdiction" to impose a lien on an allotment "for the payment of attorney's fees and necessary expenses of the litigation."[99] However, the court emphasized that "a lien on the property *cannot be*

---

[96]     181 F.2d 62, 63 (9th Cir. 1950).

[97]     *Id*.

[98]     *Id*. at 63, 66.

[99]     *Id*. at 67.

*awarded upon any contract* by and between the allottee and his attorney."[100]

Instead, an equitable attorney's fees lien imposed by "the judge as the chancellor" would be limited to a *reasonable* attorney's fees award for the instant litigation as determined by the court.[101] The Ninth Circuit remanded for the district court to "fix the dollar value of the services performed as the basis for the sum secured by the lien."[102]

Here, Ray's reliance *Arenas* is misplaced.[103] For one thing, the holding in *Arenas* was subsequently rejected by the Alaska Supreme Court. The *Tabbytite* Court explicitly declined to follow *Arenas*, explaining that "Section 410 is neither mentioned nor discussed in the *Arenas* opinion."[104] Thus, *Arenas* is not controlling as a matter of Alaska law.

More fundamentally, *Arenas* undermines Ray's claims against Joe. *Arenas* involved a federal court's equitable jurisdiction in the same litigation in

---

[100]    *Id*. (emphasis added).

[101]    *Id*.

[102]    *Id*. "It may that the value of the percentage allowed for attorney's fees upon a finding of the property value, would prove either inadequate or grossly excessive." *Id*.

[103]    Docket No. 36 at 23.

[104]    *Law Offices of Vincent Vitale, P.C. v. Tabbytite*, 942 P.2d 1141, 1148 (Alaska 1997).

which an allottee's claims against the United States were adjudicated.[105] According to the *Arenas* Court, the legislation authorizing those claims in federal court should be interpreted to "afford protection to the allottee, rather than to restrict courts of equity from giving such protection."[106] The crux of the decision was that an Indian's attorney should be compensated for bringing a claim against the United States to promote the Indian's interests. Importantly, *Arenas* explicitly rejected the premise of Ray's claims against Joe, *i.e.*, that a lawyer may bring a separate, private lawsuit against an allottee to enforce a lien that was based on a contract that had not been approved by Interior under Section 410.[107]

Second, in *United States v. Equitable Trust Company of New York*, an Indian who had been adjudged to be incompetent was "kidnapped by an adventuress" and induced to enter into an agreement conveying his allotment proceeds to a charity and other individuals.[108] The Secretary of the Interior

---

[105]    *Arenas*, 181 F.2d at 63-64.

[106]    *Id*. at 66 ("It must be remembered that the fundamental consideration is the protection of a dependent people. And legislation must be construed in the way most favorable to the Indian." (internal quotation marks and citations omitted)).

[107]    *Id*. at 67 ("[A] lien on the property cannot be awarded upon any contract by and between the allottee and his attorney.").

[108]    283 U.S. 738, 740-41 746 (1931).

approved the agreement and distributed the allotment proceeds accordingly.[109] Upon learning what had happened, the Indian's guardian filed a lawsuit seeking to rescind the fraudulent conveyances and preserve the allotment proceeds in trust for the Indian.[110] The United States eventually intervened in the lawsuit in support of the guardian.[111] In ruling for the guardian and the United States, the district court determined that the Secretary of the Interior could not validly approve a transaction involving an incapacitated Indian, and thus, the court ordered that the allotment proceeds be restored to the trust fund held by the United States for the benefit of the Indian.[112] The district court also awarded attorney's fees to the guardian with "directions that these allowances be paid out of the fund which had been the subject of the litigation."[113] The United States appealed the fees award.[114]

The Supreme Court affirmed, relying on the "general rule in courts of equity that a trust fund which has been recovered or preserved through their intervention may be charged with costs and expenses, including reasonable

---

[109] *Id.* at 741.

[110] *Id.* at 741-42.

[111] *Id.* at 742.

[112] *Id.* at 743-44.

[113] *Id.* at 744.

[114] *Id.*

attorney's fees, incurred in that behalf."[115] The Court rejected the United States' arguments that "charging the fund with the costs and expenses and requiring payment therefrom, would be disposing of a part of the fund in violation of applicable restrictions."[116] According to the Court, legislation protecting Indians' allotment proceeds was not "intended to restrain courts of equity when dealing with situations like that disclosed in this litigation from applying the rules which experience has shown to be essential to the adequate protection of a wronged *cestui que trust*."[117] Importantly, the Court stressed that the amount of an attorney's fees award must be "reasonable" and reduced the award from $100,000 to $50,000, "to bring it within the *standard of reasonableness*."[118]

*Equitable Trust* does not help Ray's arguments any more than *Arenas*. Ray filed this private lawsuit against Joe, the allotee, to enforce a contingency fee agreement that had not been approved by Interior, rather than as an equitable claim for compensation in the underlying litigation to protect trust

---

[115] *Id.*

[116] *Id.*

[117] *Id.* at 745.

[118] *Id.* at 746 (emphasis added).

assets.[119] However, even if Ray were entitled to an *equitable* attorney's fees award for his work in *Oenga v. United States*, the Oenga heirs have already paid Ray more than $7 million,[120] which is more than sufficient to fairly compensate Ray under the "standard of reasonableness."[121]

Third, in *Givens v. Wallace Oenga*, Ray filed a complaint against one of the other Oenga heirs to enforce a "catch-up" agreement for Ray's fees under the Contract.[122] This Court entered default judgment against Wallace Oenga and issued orders enforcing the default judgment, including directing the Clerk of Court to sign documents authorizing the BIA to distribute funds in Wallace's trust account to Ray.[123]

---

[119]  *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257-58 (1977) (citing *Equitable Trust* as an example where federal courts may "in limited circumstances" award *"reasonable attorney's fees to the prevailing party"* in litigation) (emphasis added).

[120]  *See infra* Argument IV; Erickson Decl. at 8, ¶ 25.

[121]  *Equitable Trust*, 283 U.S. at 746.

[122]  Exhibit N at 6 [Complaint, Docket No. 1, *Givens v. Wallace Oenga*, No. 3:19-cv-00043-HRH (D. Alaska Feb. 14, 2019)].

[123]  Exhibit O at 1-2 [Order on Motion for Rule 60(b) Relief, Docket No. 90, *Givens v. Wallace Oenga*, No. 3:19-cv-00043-HRH (D. Alaska Mar. 1, 2023)].

*Givens v. Wallace Oenga* has no bearing on this case. Even if Joe were bound by the outcome in Wallace's case, which he is not,[124] the default judgment has no preclusive effect in subsequent cases because it was not a decision on the merits.[125] This Court has not yet determined whether the Contract violates Section 410.[126] Now that the issue is squarely presented by this motion, this Court should conclude that the Contract is illegal and unenforceable.[127]

## III. Public policy reasons behind Section 410 support concluding that the Contract is illegal and unenforceable.

Congress enacted Section 410 as part of its fiduciary responsibility to Alaska Natives.[128] The "provision found its way into the law for the protection of the Indians, who were wards of the government."[129] The statute "is designed

---

[124] *See Taylor v. Sturgell*, 553 U.S. 880, 891 n.4 (2008) ("For judgments in diversity cases, federal law incorporates the rules of preclusion applied by the State in which the rendering court sits."); *Powers v. United Servs. Auto Ass'n*, 6 P.3d 294, 297-98 (Alaska 2000) (stating that a non-party may only be bound by a prior judgment if the non-party was in "privity" with the party that actually litigated a case that resulted in a final judgment on the merits).

[125] *Wall v. Stinson*, 983 P.2d 736, 740 (Alaska 1999) ("[D]efault judgments should not be given any issue-preclusive effect, because they do not entail a full and actual litigation of the underlying factual issues.").

[126] *See* Docket No. 78 at 7.

[127] *See Leisnoi, Inc. v. Merdes & Merdes, P.C.*, 307 P.3d 879, 888 n.27 (Alaska 2013).

[128] *See Pretty Paint v. Rocky Mtn. Re'gl Director*, 38 IBIA 177, 178-79 (2002).

[129] *Jordan v. O'Brien*, 9 N.W.2d 146, 148 (S.D. 1943).

to exempt certain Indian property from liability for the payment of certain debts,"[130] ensuring that those proceeds are available for the benefit of Alaska Natives.[131] To that end, Section 410 provides an essential safety net for Alaska Natives who may lack the education and business experience to protect themselves from more sophisticated business parties. Although paternalistic (and perhaps an anachronism), Section 410 remains an important provision that implements the federal government's fiduciary responsibilities to Alaska Natives, particularly future generations who will inherit interests in allotments.

Here, Ray took advantage of the fact that Interior never approved the Contract by presenting the Oenga heirs with a fee agreement in violation of Alaska's ethical rules.[132] First, Ray never disclosed the potential conflicts of interest arising from his common representation of the Oenga heirs. Alaska

---

[130]  *Law Offices of Vincent Vitale, P.C. v. Tabbytite*, 942 P.2d 1141, 1147 (Alaska 1997).

[131]  *See First-Citizens Bank & Trust Co. v. Harrison*, 326 P.3d 808, 812 (Wash. Ct. App. 2014) (concluding that Section 410 "continues to protect any money accruing from the lease of Indian trust land, even after it has been distributed to a Native American and placed in a personal bank account").

[132]  Discovery in this case is ongoing. Joe reserves his factual and legal arguments that the Contract violates public policy and is therefore unenforceable. *See, e.g.*, *Shtauber v. Gerson*, 239 F. Supp. 3d 248, 253-54 (D.D.C. 2017) ("[R]ules of professional conduct are statements of public policy, and contrary contracts are generally unenforceable." (citing *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 2d 568, 580-81 (W.Va. 2013))).

Rule of Professional Conduct 1.7 prohibits a lawyer from engaging in a representation involving a conflict of interest. A conflict of interest can arise if "the representation of one client will be directly adverse to another client" or if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client."[133] In certain circumstances, conflicts of interest may be waived by the clients but only after each client gives informed consent.[134]

The comments to Professional Rules 1.7 and 1.8 highlight the "special considerations" for lawyers entering into a common representation of multiple clients. Because a lawyer owes a duty of loyalty to each client, a common representation presents a significant and foreseeable risk that the representation

---

[133]    Alaska R. Prof. Conduct 1.7(a).

[134]    The version of Professional Rule 1.7(b) in effect in 2003 when Ray's representation began provided: "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client . . . unless: . . . (2) the client consents after consultation. *When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved*." Alaska R. Prof. Conduct 1.7(b) (2003) (emphasis added).

*Givens v. Delia*                                               Case No. 3:23-cv-00121-HRH
Motion and Memorandum in Support of Summary Judgment      Page 42 of 53

of all clients must end if any of the clients become adverse to one another.[135] "Differences in willingness to make or accept an offer of settlement are among the risks of common representation of multiple clients by a single lawyer,"[136] and "should be discussed before undertaking the representation, as part of the process of obtaining the clients' informed consent."[137] Ray never disclosed the risks of the common representation or received written conflict waivers from the Oenga heirs.

Importantly, the Contract included a prohibited settlement-voting provision, providing that "[i]n the event of any proposed settlement, Clients agree that the affirmative vote and affirmation of more than 75% of the Clients'

---

[135] Alaska R. Prof. Conduct 1.7, Comment ("In some situations, the risk of failure is so great that multiple representation is plainly impossible. For example, a lawyer cannot undertake common representation of clients where contentious litigation or negotiations between them are imminent or contemplated.).

[136] Alaska R. Prof. Conduct 1.8, Comment.

[137] Alaska R. Prof. Conduct 1.7, Comment ("Any limitations on the scope of the representation made necessary as a result of the common representation should be fully explained to the clients at the outset of the representation.").

interest in the Lease shall be controlling, and the attorney, and all parties dealing with the attorney, shall have the right to rely on this vote or affirmation."[138]

In *Hayes v. Eagle-Picher Industries, Inc.*, the United States Court of Appeals for the Tenth Circuit concluded that a similar "majority rule" agreement among a lawyer and multiple clients was "violative of the basic tenets of the attorney-client relationship."[139] Like Ray's Contract, the agreement in *Hayes* provided "that the majority rule would govern acceptance of a settlement."[140] When two clients objected to a settlement that had been agreed to by a majority of the other clients, the Tenth Circuit held that the "majority rule" agreement was invalid:

> In our view, however, this arrangement is contrary to the plain duties owed by an attorney to a client. An agreement such as the present one which allows a case to be settled contrary to the wishes of the client and without his approving the terms of the settlement is opposed to the basic fundamentals of the attorney-

---

[138] Exhibit D at 2. *But see* Alaska R. Prof. Conduct 1.8(g) ("A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients . . . unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all claims or pleas involved and of the participation of each person in the settlement.").

[139] 513 F.2d 892, 894 (10th Cir. 1975).

[140] *Id.*

client relationship. Inasmuch as the attorney is merely an agent for the client in negotiation and settlement, the approval of the client is an all[-]important essential to a settlement which is to be binding, and if this approval is not present the court is placed in a most unfavorable position in enforcing it.[141]

Ultimately, conflicts of interest that likely should have ended Ray's representation of the Oenga heirs arose at least by 2011 during the *Oenga v. United States* settlement negotiations. Ray learned that the United States and oil companies would not agree to a settlement unless all of the Oenga heirs signed,[142] despite the Contract provision authorizing a 75%-majority vote on settlement.[143] At a meeting in August 2011, "things got heated" when one of the Oenga heirs did not want to sign the settlement agreement.[144] Instead of determining that there was a conflict of interest, Ray prepared documents to facilitate a bribe from one of the other Oenga heirs to the holdout, allowing the settlement agreement to have unanimous approval.[145] There is no question

---

141    *Id*.

142    Exhibit P at 1 [Memorandum from Raymond C. Givens to Oenga Heirs (Aug. 5, 2011)].

143    Exhibit D at 2.

144    Exhibit G at 5; *see* Exhibit Q [Oenga heirs' settlement ballot].

145    Exhibit B at 6.

that Ray violated his professional duties by helping one of his clients pay off another client while keeping that bribe secret from the other clients.[146]

Second, Ray failed to disclose whether his costs would be deducted before or after the contingent fee was calculated. Under Professional Rule 1.5, a contingent fee agreement "shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer; . . . litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated."[147] The Contract did not address whether litigation costs would be deducted before or after the contingent fee was calculated,[148] and Ray admitted that his method of calculating his fees was questioned by the BIA.[149]

---

[146] *See* Alaska R. Prof. Conduct 1.7, Comment ("As to the duty of confidentiality, continued common representation will almost certainly be inadequate if one client asks the lawyer not to disclose to the other client information relevant to the common representation. This is so because the lawyer has an equal duty of loyalty to each client, and each client has the right to be informed of anything bearing on the representation that might affect that client's interests and the right to expect that the lawyer will use that information to that client's benefit.").

[147] Alaska R. Prof. Conduct 1.5(c).

[148] *See* Exhibit D.

[149] Exhibit J.

Although Ray eventually amended the Contract in response to concerns raised by the BIA,[150] the Contract was not corrected until 2012.[151] Joe and the Oenga heirs had been making payments to Ray for at least six years under a fee agreement that violated Professional Rule 1.5.[152]

Third, Ray never disclosed that he was not licensed to practice law in Alaska. "A person not an active member of the Alaska Bar and not licensed to practice law in the state who engages in the practice of law or holds out as entitled to engage in the practice of law . . . is guilty of a class A misdemeanor."[153] Ray was never licensed to practice law in Alaska; however, this Court concluded that Ray "was engaged in the practice of law in Alaska while he was representing the Oenga heirs."[154] Ray's unlawful representation of the Oenga heirs likely resulted in a material limitation on the representation, which was never disclosed to the Oenga heirs.[155]

---

[150]    Exhibit K at 6.

[151]    Exhibit J at 2.

[152]    Erickson Decl. at 8, ¶ 25.

[153]    AS 8.08.230(a).

[154]    Exhibit E at 17.

[155]    *See* Exhibit D at 1 ("Attorney shall represent Clients in said matter and do all things necessary, appropriate, or advisable, in regard thereto, whether the same be by representation in legal proceedings or otherwise, against the Lessee or any other person, entity, department or agency, including governmental entities, departments or agencies.").

Ray's representation of the Oenga heirs, beginning with the Contract, was rife with serious ethical violations. Section 410 was enacted to protect allottees from contracts obligating proceeds from their trust property in circumstances just like this.

## IV. Ray's estate is not entitled to the remedy of quantum meruit because the Oenga heirs already paid Ray a reasonable amount of fees.

Finally, upon concluding that the Contract is illegal and unenforceable, this Court should determine that Ray's estate is not entitled to any relief under the doctrine of quantum meruit. Ray already received fair compensation for his work; he is entitled to nothing more.

The general rule is that a lawyer is not entitled to enforce an illegal fee contract;[156] however, in some circumstances involving an illegal fee contract, the lawyer "may seek recovery in quantum meruit."[157] Quantum meruit is an equitable remedy synonymous with claims for unjust enrichment, quasi-contract, or a contract implied-in-law.[158] "Under the doctrine of quantum meruit,

---

[156] *Leisnoi, Inc. v. Merdes & Merdes, P.C.*, 307 P.3d 879, 888 (Alaska 2013).

[157] *Id.* at 894; *Kelley v. Donohue (In re Estate of Katchatag)*, 907 P.2d 458, 464 (Alaska 1995).

[158] *Alaska Sales & Serv. v. Millet*, 735 P.2d 743, 746 n.6 (Alaska 1987); *accord Raymond James Trust, N.A. v. Husby*, No. 3:19-cv-0138-HRH, 2019 U.S. Dist. LEXIS 88240 at * 3 (D. Alaska May 23, 2019).

when a valid contract does not exist, a plaintiff is entitled to the 'reasonable value of the services rendered to the defendant.' "[159] "Recovery is based 'on the equitable maxim that one person should not be unjustly enriched to the detriment of another.' "[160]

In Alaska, where Ray "was engaged in the practice of law,"[161] lawyers are limited to recovering reasonable fees.[162] When there is not a valid contract establishing the fee, the court may independently determine the amount of a reasonable fee to award.[163] Alaska courts generally apply the modified lodestar method by multiplying the number of hours the lawyer worked by a reasonable

---

[159]    *Romero v. Cox*, 166 P.3d 4, 9 (Alaska 2007) (quoting *Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 419 (Alaska 2001)).

[160]    *Alaska Sales & Serv.*, 735 P.3d at 746 (quoting *Nordin Constr. v. City of Nome*, 489 P.2d 455, 464 n.9 (Alaska 1971)); *see also Fairbanks N. Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1029 (Alaska 1986) ("The majority rule in quantum meruit recovery is that absent an agreement fixing compensation, any evidence tending to show the reasonable value of services is generally admissible.").

[161]    Exhibit E at 17.

[162]    Alaska R. Prof. Conduct 1.5.

[163]    *See Owen Jones & Sons v. C.R. Lewis Co.*, 497 P.2d 312, 314 (Alaska 1972) ("[T]he amount of attorney's fees was within the sound discretion of the trial court.").

hourly rate, and then adjusting that baseline amount to account for the lawyer's risk in taking a case on a contingent fee.[164]

Here, it is impossible to accurately apply the modified lodestar method because Ray did not keep records of the time that he worked on the Oenga heirs' matter.[165] Nevertheless, there is ample evidence for this Court to conclude that Joe and the Oenga heirs already paid Ray a reasonable fee. Between 2006 and 2021, the Oenga heirs (including Joe) paid Ray $7,029,654.41—of which $6,579,092.00 was allocated to Ray's attorney's fees.[166] Assuming for the purposes of this motion only, that Ray reasonably worked 7,000 hours, as he

---

[164]    *Rusch v. Se. Alaska Reg'l Health Consortium*, 563 P.3d 2, 11 (Alaska 2025) ("The modified lodestar method is used to award attorney's fees under statutes that authorize fee shifting for certain types of claims."); *Adkins v. Collens*, 444 P.3d 187, 199 n.34 (Alaska 2019) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983))); *Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 757-59 (Alaska 1996) (recognizing that "whether the fee is fixed or contingent" is a factor that courts may consider in deciding whether to adjust the lodestar amount); *see also Cooper v. Thompson*, 353 P.3d 782, 798 (Alaska 2015) (concluding that it was error to award Rule 68 attorney's fees based on a contingent fee contract instead of based on actual hours worked).

[165]    Exhibit B at 4 ("I didn't keep good time records because it was a contingent case. As a matter of fact, and I think in March of [2011] – when would it have been – well, I just quit keeping time records all together.").

[166]    Erickson Decl. at 8, ¶ 25.

claimed,[167] and his paralegal reasonably worked 3,000 hours at $325.00 per hour,[168] then the Oenga heirs have compensated Ray at a rate of at least $800.00 per hour, to date.[169] Ray initially offered to represent the Oenga heirs on an hourly basis with a rate of $200.00 per hour.[170] Thus, Ray's compensation, so far, has been more than quadruple what he considered to be a reasonable rate for the Oenga heirs' case.

Importantly, although the fees that Joe and other Oenga heirs have already paid are reasonable, Ray's estate is seeking to enforce the Contract in the future each year until 2038.[171] If the full Contract fees are paid going forward—totaling hundreds of thousands of dollars more each year—Ray's effective hourly rate would increase significantly and far exceed what any Alaska court would consider to be within the "standard of reasonableness."[172]

Under the circumstances, this Court should conclude that Ray's estate is not entitled to restitution because the fees that have already been paid

---

[167]    Exhibit B at 8.

[168]    Exhibit B at 8; *see* Erickson Decl. at 9, ¶ 26.

[169]    Erickson Decl. at 9, ¶ 26.

[170]    Exhibit T at 1 [Letter from Raymond C. Givens, to Michael D. Stotts (Sept. 11, 2003)].

[171]    Docket No. 1 at 14; Exhibit F at 2.

[172]    *United States v. Equitable Trust*, 283 U.S. 738, 740-41, 746 (1931).

adequately compensated Ray for the risk of the contingent fee representation. Equity compels this Court to leave the parties to this illegal bargain where it finds them and "grant no remedy to either party."[173]

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment to Joe and dismiss Ray's estate's claims. The Contract between Ray and the Oenga heirs violates Section 410, and thus, it is illegal and unenforceable. Ray is not entitled to any equitable relief because has already received a reasonable fee for his services.

Respectfully submitted.

DATED: June 6, 2025                    LANDYE BENNETT BLUMSTEIN LLP

*/s/ Andrew Erickson*

Andrew Erickson, Alaska Bar No. 1605049
Matt Mead, Alaska Bar No. 0711095

*Attorneys for Defendant Joseph Delia*

---

[173]    *Pavone v. Pavone*, 860 P.2d 1228, 1231 (Alaska 1993).

*Givens v. Delia*                              Case No. 3:23-cv-00121-HRH
Motion and Memorandum in Support of Summary Judgment      Page 52 of 53

## CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.4

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify compliance with the page/word limitation of Local Civil Rule 7.4(a)(1). This combined motion and memorandum contains 9,624 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). This memorandum has been prepared in a proportionally spaced typeface, Century Schoolbook, 13-point font, and I obtained the word count using Microsoft Word.

*/s/ Andrew Erickson*
_____
Andrew Erickson


## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Andrew Erickson*
_____
Andrew Erickson