Andrew Erickson, Alaska Bar No. 1605049
Matt Mead, Alaska Bar No. 0711095
LANDYE BENNETT BLUMSTEIN LLP
701 West Eighth Avenue, Suite 1100
Anchorage, AK 99501
(907) 276-5152
andye@lbblawyers.com
mattm@lbblawyers.com

*Attorneys for Defendant Joseph Delia*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MARIA M. GIVENS, as Personal Representative of the Estate of Raymond C. Givens,<br><br>    Plaintiff,<br><br>  v.<br><br>JOSEPH DELIA,<br><br>    Defendant. | Case No. 3:23-cv-00121-SLG |

## APPENDIX TO DEFENDANT'S MOTION FOR JURY TRIAL

Case 3:23-cv-00121-SLG   Document 150-1   Filed 05/19/26   Page 1 of 28

# TABLE OF CONTENTS

**English Cases**

*Denew v. Daverell,*
     (1813) 170 Eng. Rep. 1442 (K.B.); 3 Camp. 449...........................................4

*Frathers v. Bryan,*
     (1747) 95 Eng. Rep. 561 (K.B.); 1 Wils. K.B. 180......................................6

*Gatehouse v. Row,*
     (1697) 87 Eng. Rep. 671 (K.B.); S.C. 2 Salk. 663;
     S.C. Comb. 404; S.C. Carth. 379; S.C. 1 Ld. Ray. 145................................7

*How v. Norton,*
     (1677) 83 Eng. Rep. 358 (K.B.); S.C. 1 Sid. 272, 150;
     2 Keb. 8; 1 Danv. 29, 50; 1 Lev. 180...........................................8

*Smith v. Johnson,*
     (1699) 88 Eng. Rep. 1252 (K.B.); 12 Mod. 187............................................9

*Snow v. Firebrace,*
     (1701) 91 Eng. Rep. 1309 (K.B.); S.C. Holt, 609; Salk. 557;
     12 Mod. 434.....................................................................10

*Warbrook v. Griffin,*
     (1609), 123 Eng. Rep. 927 (C.P.); 2 Brownlow 254;
     S.C. Moore 876-877..............................................................11

**Treatises**

Excerpts from James B. Ames, Lectures on Legal History (1913).....................13

Excerpts from James W. Eaton, Handbook of Equity Jurisprudence
(Throckmorton 2d ed. 1923)......................................................................15

Excerpts from W. S. Holdsworth, A History of English Law (Vol. I)
(3d ed. 1922)......................................................................20

Excerpts from W. S. Holdsworth, A History of English Law (Vol. III)
(3d ed. 1922)......................................................................26

the possession of the glebe lands, as well as to the receipt of the tithes. Besides, by the voluntary act of the rector himself, he had waived the notice to quit, and affirmed the tenancy. The guinea and a half a week was tantamount to the payment of rent; and it was expressed to be for the rent of the glebe land in the written receipt signed by the rector himself. It is clear that he is not now entitled to the possession of the glebe land; and even supposing that there was a short interval after the expiration of the notice to quit when the defendant might be considered as a trespasser, he ceased to be so when the sequestration had taken full effect; and he was now entitled to retain possession of the premises. A writ of *habere facias possessionem*, therefore, can no longer be sued out; and the ejectment cannot be supported.

Dampier, J.—The sequestration did not take effect till the 17th of January, when it was read in the parish church. The notice to quit expired on the 25th of December. Between these two days the defendant was a trespasser. I think the rector is not now entitled to the possession of the glebe lands, and that he cannot sue out a writ of *habere facias possessionem* in this action. Regularly, the judgment [449] on which the sequestration issued should have been produced; but the necessity for that is obviated by the rector's recognition of the validity of the sequestration, and that recognition refers back to the 17th of January, when it was published in the church. From that day he is not entitled to the rents and profits of the glebe lands, while the seques-[450]-tration remains in force; but he is entitled to such rents and profits down to that time from the expiration of the notice to quit. For this reason I think the ejectment maintainable. The present is like the case of tenant for life dying pending an ejectment. Possession is not to be recovered, but the ejectment is the medium through which the party may recover the mesne profits of the lands.

The lessor of the plaintiff had a verdict.

In the ensuing term Abbott moved the Court of K. B. for a rule to shew cause why the verdict should not be set aside, and a new trial granted; or why the lessor of the plaintiff should not be restrained from taking out execution upon the judgment. But the Court fully approved of the direction given by the learned Judge at Nisi Prius; and said, it would be time enough to consider in what shape the lessor of the plaintiff was entitled to execution, when it appeared that he meant to disturb the possession of the defendant.

Rule refused.

Jervis and Campbell for the lessor of the plaintiff.

Dauncey and Abbott for the defendant.

[451] IN THE COURT OF KING'S BENCH, AT THE SITTINGS AFTER MICHAELMAS TERM, IN THE FIFTY-FOURTH YEAR OF THE REIGN OF GEORGE III. [1813].

First Sittings after Term at Westminster.

Tuesday, Nov. 30, 1813.

DENEW *v.* DAVERELL, ESQ.

(If an auctioneer employed to sell an estate is guilty of negligence, whereby the sale becomes nugatory he is not entitled to recover any compensation for his services from the vendor.)

Action for work and labour, money paid, &c.

The plaintiff, who is an auctioneer, was employed by the defendant, a gentleman of fortune, to sell for him a leasehold house in Grosvenor-street. The plaintiff advertised the house, and made out a particular of the conditions of sale, which was submitted to the defendant, and which he approved of. This did not contain any proviso that the vendor was not to be called upon to shew the title of the lessor. The lease of the house was bought upon this particular by Lord Bolton, who immediately called upon Mr. Daverell to shew that Lord Grosvenor, the lessor, had power to grant the lease. A bill being filed for a specific performance, the Chancellor held, that the vendor, without an express stipulation to the contrary, was bound to shew [452] the title of the lessor; and Mr. Denew was not in a situation to do so. Lord Bolton accordingly brought an action against the auctioneer, and recovered back his deposit. The amount of the damages and costs in that action was now paid into Court. The plaintiff sought to recover further two and a half per cent. commission upon the sum for which the lease was sold to Lord Bolton.

The defence was, the plaintiff's negligence in conducting the sale ; and several witnesses were called, who stated that it has been the constant usage of auctioneers, for a number of years, when employed to sell leasehold property, to insert a proviso in the particular, that the vendor shall not be called upon to shew the title of the landlord.

Garrow, A. G., for the plaintiff, insisted this was no defence to the action,—more especially as the defendant himself had seen and approved of the particular under which the house was sold.

Lord Ellenborough.—Where there is a special contract for a stipulated sum to be paid for the business done by the plaintiff, it has been usual to leave the defendant to his cross-action for any negligence he complains of. But where the plaintiff proceeds, as here, upon a *quantum meruit*, I have no doubt that the just value of his services may be appreciated ; and that if they are found to have been wholly abortive, he is entitled to recover no compensation. In the present case, the plaintiff appears to have been guilty of gross negligence, and the defendant has suffered **[453]** an injury instead of deriving any benefit from employing him. A practice has very properly sprung up among auctioneers in selling leasehold property, to insert a clause in the particulars of sale, that the vendor shall not be called upon to shew the title of the lessor. The plaintiff was bound to take notice of that practice, and to insert such a clause in the particulars of sale of the defendant's house. Had this been done, the defendant would have been secure ; and Lord Bolton must have completed the purchase. By the omission, the defendant has the house thrown back upon his hands with expensive litigation. It is no answer that the particulars were shewn to him, and that he made no objection to them. I pay an auctioneer, as I do any other professional man, for the exercise of skill on my behalf which I do not myself possess ; and I have a right to the exercise of such skill as is ordinarily possessed by men of that profession or business. If from his ignorance or carelessness he leads me into mischief, he cannot ask for a recompence ; although, from a misplaced confidence, I followed his advice without remonstrance or suspicion.

The jury found a verdict for the defendant.[*1]

Garrow, A. G., and Comyn for the plaintiff.

Topping and Bowen for the defendant.

[Attornies, Greenwell and Strong.]

**[454]**    Tuesday, Nov. 30, 1813.

GREGORY v. FRASER.

(Although a promissory note without a stamp cannot be received in evidence as a security, or to prove the loan of money, it may be looked at by the jury with a view to ascertain a collateral fact.)

[Referred to, *Ashling* v. *Boon*, [1891] 1 Ch. 568.]

This was an action for money lent.

The witnesses for the plaintiff, who keeps a billiard table, stated, that on the evening of the 25th of May last he lent £40 to the defendant, who gave a promissory note for the amount on an unstamped piece of paper, which was produced by the plaintiff.

The defendant's case was, that he had been made drunk by the plaintiff, and induced to write a promissory note for £40, no part of which sum he had received.

Lord Ellenborough.—The note certainly cannot be received in evidence as a security, or to prove the loan of the money ; but I think it may be looked at by the jury as a contemporary writing to prove or disprove the fraud imputed to the plaintiff.

The note was accordingly put in, and had very much the appearance of being written by a man in a state of intoxication.

The jury found a verdict for the defendant.[*2]

Park and Comyn for the plaintiff.

Garrow, A. G., and Adam for the defendant.

[Attornies, Boot and Hoare.]

---

[*1]  *Vide Farnsworth* v. *Garrard*, 1 Campb. 38.
[*2]  *Vide Rex* v. *Pendleton*, 15 East, 449 ; *Morton's* case, 2 East, P. C. 955.

Case 3:23-cv-00121-SLG    Document 150-1    Filed 05/19/26    Page 5 of 28

directed by the plaintiff's grandfather's will; and it appearing in the cause that the plaintiff has covenanted with several persons to grant them annuities out of such lands as shall descend or come to him in case he shall survive his father, it was objected by the defendant's counsel that these annuitants ought to be before the Court; and I think this is a material objection, for these covenants to grant annuities are equitable liens upon the lands, whereof the trustees now have notice; and if I should order the deeds to be brought into Court, the same might afterwards, upon the motion of the father and son (when they may be better friends) be delivered to them out of Court, and then they might join in selling the estate to a purchaser for a valuable consideration without notice of these annuitants, and the annuitants could have no remedy but by bringing a bill [180] against the trustees and the son; so that by making such order or decree as is prayed, without hearing the annuitants, might possibly be doing them injustice, and therefore the cause must stand over, with leave to amend by adding all proper parties, and the defendants must be paid the costs of the day.

## HILARY TERM, 21 GEO. II. 1747.

FEATHERS *versus* BRYAN. In Error. B. R. Plaint levied in an Inferior Court before the cause of action accrued, is helped after a verdict.

This was an action upon the case upon a quantum meruit in the Palace Court, wherein the plaintiff below declares, that in consideration he had permitted the defendant to enjoy such a messuage, being within the jurisdiction of the Court for a long space of time, to wit, for the space of three quarters of a year, ending the 25th day of March last, he the defendant, upon the 20th day of the same month of March, at Southwark, within the jurisdiction of the said Court, promised to the plaintiff to pay him so much money as he reasonably deserved to have for the same, &c. There was a verdict for Bryan the plaintiff below, and a writ of error being brought, it appears upon the transcript of the record that the plaint was levied at a Court held upon the 10th of March last, which is before the three quarters of a year ended, for which time of enjoyment of the house the action is brought, and this is assigned for error.

Mr. Ford for the plaintiff in error.—To shew that this was error cited 1 Rol. Abr. 792, pl. 12. Cro. Jac. 69, 70. Yelv. 70. And said, this is not like the case where the day in the declaration appears to be before the cause of action, for though the day of the promise be laid to be made before the cause of action arose, yet it is not traversable.

Mr. Bennè for the defendant in error.—This is after a verdict, and helped by the stat. 18 Eliz. c. 14, s. 1, which has been de-[181]-termined to extend to Inferior Courts, Salk. 266, and in the case of *Thayer or Sayer & Ux.* v. *Curtis,* Hil. 10 Geo. 2, Rotulo　argued Pasch. 10 Geo. 2, being an action of assault and battery in the Palace Court; and upon error brought it appeared that the plaint was levied six or seven days before the day of the assault laid in the declaration; and per totam Curiam. —This being after a verdict is aided by the Stat. 18 Eliz. and the Court intended there was no plaint at all; and in Pasch. 9 Geo. 1, C. B. Rotulo 57, *Waterton* v. *Plaxton,* which was an action of assault and battery, and upon error brought it appeared that the day in the declaration was after the teste of the original writ; this case was argued by Mr. Fazakerley and Mr. Reeve, and being after a verdict per Curiam, was helped by the Stat. 18 Eliz.

Mr. Ford in reply.—The Stat. 18 Eliz. only helps an original which is bad for want of form, and the total want of an original, but does not help a bad original in substance, as this is.

Per Curiam.—There is no difference between this case and that of *Sayer and Curtis,* which we well remember; and the case in Yelv. is not like this, for this is a quantum meruit, that the plaintiff having permitted the defendant below to enjoy the messuage for a long time, viz. for the space of three quarters of a year, ended the 25th of March, &c. The plaintiff below was not obliged to prove the whole three quarters of a year's rent due, and for aught appears to us the jury may have found less; but if they have not, this is helped after a verdict. Judgment affirmed per totam Curiam.

Case 3:23-cv-00121-SLG　　Document 150-1　　Filed 05/19/26　　Page 6 of 28

grant there was a farm in the parish of Dale, in lease under a yearly rent; now the words "*quæ quidem omnia, &c.*" refer only to tithes of that yearly value, and it may be the King intended to pass no more; yet having granted *totam illam rectoriam* generally, it was adjudged that the tithes of that farm should pass, though it made it more than thirty-two pounds a year. The true way had been to have taken issue upon the traverse (*e*).

### CASE 138.  GATEHOUSE *against* ROW.

Declaration upon three several promises, the last stating *cumque etiam* the aforesaid defendant, in consideration that the plaintiff provided goods, &c. *super se assumpsit* is good after verdict.—S. C. 2 Salk. 663.  S. C. Comb. 404.  S. C. Carth. 379. S. C. 1 Ld. Ray. 145.

Writ of error on a judgment in the Common Pleas, in an action on the case upon an *indebitatus assumpsit* and *quantum meruit*, brought by Gatehouse for meat, drink, &c. which the defendant had when he stood for burgess for Stockbridge.

The declaration stated three several promises, the last of which was thus, "*cumque etiam præd.* (the defendant) *in consideratione* that the plaintiff at his request had found and provided for him meat, drink, &c. *super se assumpsit,*" and does not say that the defendant *super se assumpsit.* This cause was tried at the assizes at Winton, and a verdict for the plaintiff Gatehouse, and entire damages given.

It was now moved in arrest of judgment, that the last was a void promise, because it was not alledged that *the defendant* had promised: so that possibly a stranger might make the promise, and then the defendant is not bound by it. It cannot be taken by intendment to be the defendant, because it is the very *gist* of the action, and since the jury have found that "*Row super se assumpsit modo et formâ,*" and have assessed entire damages *occasione præmissorum,* and every promise being a distinct declaration, and one of them being wrong laid, it is therefore naught. As for instance, in *assumpsit* the plaintiff declared (*a*), that in consideration he would marry the defendant's daughter, *super se assumpsit* to pay the plaintiff one hundred pounds. Upon *non assumpsit* pleaded, the plaintiff had a verdict; but the judgment was arrested, because it was not alledged that the defendant *super se assumpsit,* which is this very case in point. **[306]** This might have been good in an *indebitatus assumpsit* (*b*), because where there is a debt, the law fixes a promise upon the debtor to pay it.

To which it was answered, that if the consideration be void, then the jury have not given damages for it, for they cannot give a verdict either for no promise, or a bad promise. As to that case in Croke before-mentioned, there were three persons named in that declaration, of which the defendant's daughter was last named, and the words *super se assumpsit* immediately following might relate to her, which was the reason of that judgment; but here there are but two persons named, so that when the plaintiff declares against the defendant, it must of necessity be intended, that the defendant *assumpsit,* and nobody else, because the consideration arises from him, and those words *cumque etiam* in the third promise couple that sentence to the first. If it had been, that the plaintiff *assumpsit* to pay himself, it had been good after a verdict (*c*). So if there are several considerations alledged in one declaration, and one of them is sufficient, though the other are wrong, both as to matter and form, yet the declaration will be good (*d*). So where an *assumpsit* was brought against an executor upon the promise of the testator, and the defendant pleaded, that *he himself* made no such promise; after a verdict it shall be intended to refer to the promise of the testator (*e*).

Afterwards, in Hilary term, the plaintiff had judgment, it being after a verdict.

---

(*e*) The judgment of the Common Pleas was affirmed by Holt, Chief Justice, and by Turton and Eyre, Justices, S. C. 2 Salk. 561.  S. C. Skin. 664, the three Judges being of opinion that *the variance* (*vide ante,* 302) was so great an obstacle that they could not come at the merits of the cause, and that for this defect the plea was ill. S. C. Ld. Ray. 305.  But a writ of error was brought in Parliament, and this judgment was reversed.  S. C. Shower, Cases in Parl. 224.  S. C. 12 Mod. 187.

(*a*) Cro. Eliz. 913.  S. C. Noy, 50.                    (*b*) 1 Salk. 23, 28.
(*c*) 1 Sid. 306.  2 Vent. 141.    (*d*) Cro. Eliz. 848.    (*e*) 1 Sid. 292.  Latch, 125.

Case 3:23-cv-00121-SLG    Document 150-1    Filed 05/19/26    Page 7 of 28

was payable in satisfaction of all fish there taken, and if the twelfth sheaf was payable in satisfaction of all sheaf-corn?  And by the Court, tithes of fish are not due without custom, and therefore a custom to pay less than a tenth part may be good; but of corn the tenth part may be due of (common) right, and therefore a custom to pay *nothing*, is not good without other matter.  But they granted the prohibition as to the whole *nisi causa*, with intent to hear what the other party had to say.

### JOHN GROBHAM HOW *against* NORTON.

*Assumpsit* on a *quantum moruit*, if he permitted him to enjoy land.  S. C. 1 Sid. 272, 150.  2 Keb. 8.  1 Danv. 29, 50, 22.

*Assumpsit* in consideration the plaintiff would permit the defendant to enjoy such lands, to pay him as much as he deserved, and that he permitted him to enjoy it three years, and that it was worth 10l. per annum.  After verdict for the plaintiff, 'twas moved in arrest of judgment; 1. That it does not appear that the plaintiff had any title to the land.  2dly. If he had (title) that debt lies and not this action.  But the Court held the contrary in both points, and gave judgment for the plaintiff.

### [180] ROSSE *against* ROSSE.

Rent devised out of a term, if suable in the Spiritual Court.  S. C. 1 Sid. 279. 2 Keb. 5.  3 Bac. Abr. 489.  Cowp. 424.  Ld. Raym. 86.

A prohibition was prayed to stay a suit in the Spiritual Court for rent devis'd out of a term; and rent devised out of lands, is not suable there, Dyer 151 b. 264. 2 Cro. 279.  Hob. 265.  Wyndham said, that the devise of the term itself is suable there; and for the same reason is the rent thereout.  Kelynge and Twysden doubted, yet did not grant a prohibition, but ruled to stay proceedings till the other party be heard.

### BROMWICH'S CASE.

A peer found guilty of manslaughter without reading.  S. C. 1 Sid. 277.  2 Keb. 19.

The Lord Morly and Bromwich being indicted for the murther of Hastings, the Lord Morly was tried by his peers before the Lord High Steward, and found guilty of man-slaughter, and was dismissed without being put to his book, or burnt in the hand, according to the statute of 1 E. 6, c. 12.  And now Bromwich being brought to his trial at the Bar of the King's Bench, the indictment was against the Lord Morly for the killing of Hastings, and against Bromwich for being present, aiding and assisting; and 'twas proved by one witness, that the Lord Morly killed Hastings, but that at the same time they were fighting, Bromwich made a thrust at Hastings, and thereupon the Lord Morly closed with him and killed him; and the depositions of two other witnesses taken before the coroner, which were now dead, were read to the same effect, as they were read before the lords on the trial of the Lord Morly, by the opinion of all the Judges of England.  And it was proved, that when the quarrel was in the tavern, the Lord Morly said, *If we fight at this time, I shall have the disadvantage from the heighth of the heels of my shoes*, and that presently afterwards they went out into the fields, and Hastings was there killed; which was taken by the Court as a clear evidence of their intention to fight when they went out of the tavern; and the quarrel being only touching words, and they fighting within a little time after, it was held murther by the whole Court: for words cannot be [181] any excuse for the killing of a man, and there need not be the time of a night between the quarrel and the fighting to make it murther, but such time only as it may appear not to have been done on the first passion; and here it appears not to be done on the first passion, for the Lord Morly had considered the disadvantage of his shoes: and the Court directed the jury, that it was murther in Bromwich, being present and aiding, although the Lord Morly had been found by the Lords to be guilty only of manslaughter.  But the jury acquitted him of the murther, and found him guilty only of manslaughter.

Case 3:23-cv-00121-SLG     Document 150-1     Filed 05/19/26     Page 8 of 28

name of knight who is no knight, it is a good grant; but there is no foundation for it; for if that be so, a name signifies nothing; and Thomas may as well take by the name of John as an *esquire* by the name of *knight*: but supposing reputation would have done, yet the defendant should have averred, that he was "an esquire, *sed cognit. et reputat.* by the name of knight."

Eyre, Chief Justice. If a feoffment be indeed made to a man by a wrong name, but livery is made to him in person, there the feoffment is good, because *constat de persona*. And the books put a difference between a grant that has its operation by a deed itself, and where it is by livery; in the former it cannot be good, in the latter it is. In the case of *The Earl of Pembroke* (a), **[187]** the issue in a *quare impedit* was, whether Sir William Sandys granted the next avoidance by the name of Sir William Sandys, Esquire? and the Court held, that the verdict had made this a good grant, but without that it had been void. As to *Lord Ewer's case* (b), a grant was made to my Lord Ewer by the name of R. Ewer, Knt. Lord Ewer; and though he was not *a knight* at that time, the grant was held good; but the reason of that was, because it was a sufficient description of the person, there being but one Lord Ewer at the time: as in Co. Lit. 3 a. if lands be given to R. Earl of Pembroke, when his name is Henry, or George Bishop of Norwich, when his name is John, the grant is good, because there can be but one Earl of Pembroke or Bishop of Norwich at a time; but here the grant is to Sir William Thexton, Knight, and the defendant pleads it to William Thexton, Esquire, which are two several persons; for which reason judgment ought to be affirmed.

This judgment was afterwards reversed in the House of Lords.


## EASTER TERM.

### The Tenth of William the Third. In the King's Bench.

Sir John Holt, Knt. Chief Justice. Sir Thomas Rokeby, Knt., Sir John Turton, Knt., Sir Samuel Eyre, Knt., Justices. Sir Thomas Trevor, Knt., Attorney General. John Hawles, Esq., Solicitor General.

### CASE 307. SMITH *against* JOHNSON.

Money to be brought into Court on *assumpsit*, but not on *quantum meruit*.

Case for work done on a *quantum meruit*, and also an *indebitatus assumpsit*. Upon motion to bring so much money into Court, and to be struck out of the declaration, the Court granted it as to the *indebitatus assumpsit*, but refused it as to the *quantum meruit*; and the Court said, that such motions had been sometimes **[188]** obtained, where a *quantum meruit* and *indebitatus* were joined together, yet regularly they ought not to be granted on a *quantum meruit*, for who can tell what a man deserves until it be tried (a).

### CASE 308. THE KING *against* HAGGARD.

*Certiorari* to remove an indictment out of Westmorland, for using a trade not being an apprentice.

Indictment at Kirby, in Westmorland, on the 5 Eliz. for using a trade, not having been apprentice thereto seven years; and a *certiorari* was prayed.

But the Court doubted whether to grant it; because the statute is, that it must be tried in the proper county; so that if it be removed hither, it must be sent down

---

(a) Litt. Rep. 181, 197, 223. 1 Cro. 173. Jones, 215.
(b) Cro. Jac. 240. 1 Bulst. 21.
(a) See *Burman* v. *Shepherd*, ante, 97. *Pawlett* v. *Heatfield*, ante, 95. *Lawley* v. *Dibble*, post, 241. *Farrell's case*, post, 397. But as to the origin of this practice, and in what cases it is at present allowed, see Tidd's Practice, 408 to 414, and the cases there cited.

2 Cro. 345. Hardr. 8. And then the special damage in this case will not help it, because it is not laid, to have been occasioned by the speaking of these words, the word occasione or praetextu being omitted. And they are not laid to have been spoken of his trade, for the word status will not import that, but it ought to have been arte vel misterio. But absente Holt Chief Justice, the Court gave judgment for the plaintiff; for the plaintiff declaring, that he was a tradesman, and that the words were spoken de statu suo, it is equivalent to arte sua, and to be intended of his trade; and then being spoken of him in his trade they are actionable, though the special damage be left out of the case. Ex relatione m'ri Jacob.

### SNOW *vers.* FIREBRACE.

#### S. C. Holt, 609. Salk. 557. 12 Mod. 434.

An assumpsit upon a quantum meruit for sufficient meat, drink, washing and lodging for divers months, is sufficiently certain, at least it is unobjectionable after verdict.

The plaintiff declared that the defendant, in consideration that the plaintiff had found him sufficientia esculenta poculenta lotionem et cubile pro diversis mensibus ultimo praeteritis, assumed to pay him as much as he should deserve, and avers that he deserved so much, &c. Upon non assumpsit pleaded, verdict for the plaintiff. And a motion was made in arrest of judgment, that this declaration was intirely uncertain, having neither certainty of time nor of things. But per Holt Chief Justice. He did not know why the uncertainty of time was worse than the uncertainty of things, which have been oftentimes adjudged good. And (by him) it is enough to aver, quantum meruit. Ex relatione m'ri Jacob.

### CLAPCOTT *vers.* DAVY.

An award directing the release of a duty without giving a satisfaction for it is not before the release is executed a bar to an action for such duty.

Indebitatus assumpsit and quantum meruit, for work done, and goods sold and delivered. The defendant pleaded an award, by which it was awarded, that the plaintiff for the work done, &c. should accept a bill of sale before made of the eighth part of the ship "Fortune," or a like bill of sale to be made, and that the plaintiff and defendant should give to each other general releases. The plaintiff demurred. And Mr. Branthwaite for the plaintiff took exception to the plea. 1. That the award is pleaded to extend to all the promises, whereas it appears, that it extends but to the work done, and therefore the defendant should have pleaded non assumpsit to the promise for the goods sold and delivered; and for want of this the plea is ill. For an award is no plea in bar, unless something be awarded in satisfaction of the plaintiff's demand; and nothing being awarded for the goods sold and delivered, it is ill. For though there is a general release [612] awarded, yet of itself that will be no bar, according to the case of *Freeman* v. *Barnard*, Trin. 9 Will. 3, B. R. ante, 247, though the suing of an action in such case may be a breach of the award, upon which the defendant might bring his action. 2. Exception. That the award was, that the plaintiff should accept the bill of sale, and the defendant was not awarded to deliver it, and so nothing was awarded to the plaintiff in satisfaction for the work done. And he compared it to the case of 2 Saund. 293. Yelv. 98.

And Holt Chief Justice said, that nothing was awarded for the goods sold and delivered, and therefore the case the same with that of *Freeman* v. *Barnard*, nothing being awarded for that but a general release. If the bill of sale had been awarded in full of all demands, it had been good. But this release awarded here is not a perfect bar, until it be executed. And as to the other matter he said, that the defendant is not enjoined to do it, which is the only satisfaction that the plaintiff should have. But the award is only, that the plaintiff should accept. And then the plaintiff cannot be barred, nothing being awarded to be done by the defendant in satisfaction.

Case 3:23-cv-00121-SLG    Document 150-1    Filed 05/19/26    Page 10 of 28

awarded, and it seems that if the writ had not been returned, that then a new writ shall be awarded, and the attachment was awarded upon affidavit.

In action upon the case against Trotman, the words were, Thou sayest thou art an attorney, but I think thou art no attorney, but an attorney's clerk in some office, but if thou be an attorney I will have thee pickt over the barr the next term, and thy ears nailed to the pillory, and it seems that these words are not actionable.

In waging of law of summons in dower, in petit cape, there ought to be two summons only, and if it be grand cape, then there ought to be two summoners, and two viewers, and summons upon the land is sufficient to give notice of the demandant, of the thing demanded, and the day in Court: that in waging law, the Lord Coke said, that the defendent himself ought to swear, de fidelitate, and eleven others, which are named in the Statute of Magna Charta, chapter            testes fideles, ought to swear de creduli.

[254] If tenant for life be, the remainder in tail to another; the remainder in fee to the tenant for life, and the tenant for life releases to the tenant in tail, the release is good to pass the remainder in fee to the tenant in tail, for to this purpose the tenant in tail hath sufficient possession, upon which the release may enure, but it shall not be good to pass the estate for life; and 19 H. 6, and 9 H. 7, if tenant in tail in remainder, disseise tenant for life, he doth not gain fee-simple by Fulthorp, but if there be grand-father, father and son, and the father makes a feoffment, the grand-father dies, the father dies, the son is barred; so if the son had levied a fine being tenant in tail, 33 and 39 H. 6, 43 a. 21 Ed. 4, Discontinuance.

PASCH. 7 JACOBI, 1609, IN THE COMMON BENCH.

WARBROOK AND GRIFFIN.

Inn-keeper in London.

Between *Warbrook and Griffin*, a guest brought a horse into an inn in London to be kept, the which staid there so long, till he had eaten out his worth, and then the inn-keeper caused the said horse to be prised, and then sold him according to the custom of London, and it seems well he might do it, and that the sale was lawful; for the inn-keeper, as to the person of his guest ought to receive him, and he is compellable to do it, as it is 5 Ed. 4, 2, and 22 Ed. 4.            And for his goods he ought to keep them safe, and of the other part the guest ought to pay the inn-keeper, as well for the meat of his horse, as for his own, as it is 28 H. 6.  And it should be inconvenient, that he should be put to his action for, &c.  And for preventing this mischief, the inn-keeper may detain the horse of his guest, till he be satisfied; and it seems to Coke Chief Justice, that an inn-keeper is not chargeable with the goods of any, which is not lodged in the inn, and the goods must be lost by default of the inn-keeper, and that the inn-keeper is not compellable to receive the horse of any, if the master be not lodged, and if a neighbour of the inn-keeper come to the inn-keeper, he shall not answer for the goods, for he is not lodged, but as a tipler, and so if an inn-keeper invite any to his house ad prandendum aut cænandum, the inn-keeper shall not be charged, as it is 35 H. 8.            For it was agreed that the guest ought to averr that he was lodged in the inn.  And Foster Justice said, that it was adjudged in the case of one Perin of the Black Swan in Holbourn, that by the custom of London, an inn-keeper may sell a horse which remains with him to be kept, and hath eaten more than he is worth; and so it was said by Foster, that where a haberdasher [255] of London came to an inn, and there sold divers hats, and after went to a fair, and left divers other hats in the inn, the which in his absence were stollen, and the inn-keeper should not answer for them; for that, that the haberdasher was not lodged in the inn at that time; and this was the case of one *Coley* in the 25 of Eliz. But Sir Edwin Sands lodged in an inn, and there left a trunck, and went to meet the King, the trunck remaining in the inn, in his absence it was stollen, and the inn-keeper was charged, quære the difference, if the owner desire that his horse should go to grass, the inn-keeper shall not answer; but if an inn-keeper receive the horse, and of his own head puts the horse to grass, and he is stollen, there the inn-keeper shall

be charged, and though the inn-keeper deliver the key of the chamber to the guest, yet the inn-keeper shall answer for the goods which are stollen, for it is an implied promise of every part, that is, of the part of the inn-keeper, and he shall preserve the goods of his guest, and of the part of the guest, that he will pay all duties and charges, which he caused in the house, and that the inn-keeper may retain (without custom) by the common law, the horse of the guest as a pledge till he be satisfied of all dues, and so a tailer and goods taken in withernam, but the inn-keeper cannot work the horse of his guest in such a case, nor sell his goods, though that they be bonæ peritura.

### TRINITY 7 JACOBI, 1609, IN THE COMMON BENCH.

### COLLEGE OF PHYSICIAN'S CASE.

#### Action of false imprisonment.

Thomas Bonham brought an action of false imprisonment against Doctor Alkins, and divers other doctors of physick: the defendents justified, that King H. 8, anno decimo of his regn, founded a College of Physicians, and pleaded the letters-patents of the corporation: and that they have authority by that to chuse a president, &c. as by the letters-patents, &c. and then pleads the Statute of 32 H. 8, chap. 40. And that the said Doctor Alkins was chosen president, according to the said act and letters patents, and where by the said act and letters-patents it is provided, that none shall practise in the City of London or the suburbs of that, or within seven miles of the said city, or exercise the faculty of physick, if he be not to that admitted by the letters of the president and college, sealed with their common seal, under the penalty of a hundred shillings; for every moneth that he (not being admitted) shall exercise the said faculty; further we will and grant for us and our successors, that by the president and [256] college of the society for the time being, and for their successors for ever, that they may chose four every year, that shall have the over-seeing, and searching, correcting, and governing, of all in the said city being physicians, using the faculty of medicines in the said city, and other physicians abroad whatsoever using the faculty of physicking by any means frequenting and using, within the city or suburbs thereof, or within seven miles in compass of the said city, and of punishing them for the said offences, in not well executing, making, and using that: and that the punishing of those physicians using the said faculty, so in the premises offending, by fines, amercements, imprisonments of their bodies, and by other reasonable and fitting ways shall be executed: note the preamble of these letters patents is, Quod cum Egregii officii nostri munus arbitremur, ditionis nostræ, Hominum felicitati omni ratione Consulere: Id autem vel imprimis fore, si improborum conaminibus tempestivé occurramus, apprimé necessarium fore duximus, improborum quoque hominum, qui medicinam magis avaritiæ sue causa, quam ullius bonæ conscientiæ fiducia profitebantur, unde Rudi & credulæ plebi plurima incommoda oriuntur, audaciam compescere. And that the plaintiff practised in London, without admission of the college, and being summoned to appear at the college, and examined if he would give satisfaction to the college according to the said letters-patents and statute, he answered that he had received his degree to be Doctor of Physick by the University of Cambridge, and was allowed by the university to practise, and confest that he had practised within the said city, and as he conceived, it was lawful for him to practise there, that upon that the said president and commonalty fined him to a hundred shillings, and for not paying of that, and his other contempt, committed him to prison, to which the plaintiff replied as aforesaid, and upon this demurrer was joyned: and Harris for the defendent, saith, that this hath been at another time adjudged in the King's Bench, where the said college imposed a fine of five pound upon a doctor of physick which practised in London without their admission, and for the non payment of that, brought an action of debt, and adjudged that it lay well, and that the Statute of 32 H. 8 extends as well to graduats, as to others, for it is general, and graduats are not excepted in the statute, nor in the letters-patents, and all the mischiefs, intended to be redressed by this, are not expressed in that, and the statute shall not be intended to punish impostors only, but all other which practise without examination and admittance, for two things are necessary to physicians, that is, learning and experience, and upon that

# LECTURES
# ON LEGAL HISTORY

AND

MISCELLANEOUS LEGAL ESSAYS

By JAMES BARR AMES

*WITH A MEMOIR*



CAMBRIDGE
HARVARD UNIVERSITY PRESS
LONDON: HUMPHREY MILFORD
OXFORD UNIVERSITY PRESS
1913

Digitized by Google

as the law was taken until the time of Henry IV. [VI.?]." [1] One is struck by the resemblance between this remark of the English judge and the German proverb about bailors: "Where one has put his trust, there must he seek it again." [2] The limitation of the bailor at common law, and the *cestui que trust* in equity, to an action or suit against the original bailee or trustee, are but two illustrations of one characteristic of primitive law, the inability to create an obligation without the actual agreement of the party to be charged. [3]

A trust, as every one knows, has been enforceable for centuries against any holder of the title except a purchaser for value without notice. But this exception shows that the *cestui que trust*, unlike the bailor, has not acquired a right *in rem*. This distinction is, of course, due to the fundamental difference between common-law and equity procedure. The common law acts *in rem*. The judgment in detinue is, accordingly, that the plaintiff recover the chattel, or its value. Conceivably the common-law judges might have refused to allow the bailor to recover in detinue against a *bona fide* purchaser, as they did refuse it against a purchaser in market overt. But this would have involved a weighing of ethical considerations altogether foreign to the medieval mode of thought. Practically there was no middle ground between restricting the bailor to an action against his bailee, and giving him a right against any possessor. Equity, on the other hand, acts only *in personam*, never decreeing that a plaintiff recover a *res*, but that the defendant surrender what in justice he cannot keep. A decree against a *mala fide* purchaser or a volunteer is obviously just; but a decree against an innocent purchaser, who has acquired the legal title to the *res*, would be as obviously unjust.

This contract of bailment was a real contract by reason of the delivery of a chattel by the bailor to the bailee. The duty of the bailee was commonly to redeliver the same chattel to the bailor, either upon demand or at some time fixed by the terms of the bail-

[1] Anon., Keilw. 46, pl. 7. See also Ames, Cases on Trusts, 2d ed., 282–285.

[2] Wo man seinen Glauben gelassen hat, da muss man ihn wieder suchen.

[3] This same inability explains the late development of assumpsit upon promises implied in fact, and of *quasi*-contracts. The necessity of the invention of the writ *quare ejecit infra terminum* as a remedy for a termor, who had been ousted by his landlord's vendee, was due to this same primitive conception, for the vendee was not chargeable by the landlord's contract.

 Digitized by Google

# HANDBOOK

OF

# EQUITY JURISPRUDENCE

By JAMES W. EATON

OF THE ALBANY BAR

PROFESSOR OF LAW IN THE ALBANY LAW SCHOOL, AND LECTURER
IN THE BOSTON UNIVERSITY SCHOOL OF LAW

## SECOND EDITION

By ARCHIBALD H. THROCKMORTON

PROFESSOR OF LAW, WESTERN RESERVE UNIVERSITY

ST. PAUL, MINN.
WEST PUBLISHING CO.
1923

Digitized by Google

The king's court followed the king in his journeys to different parts of his kingdom. This resulted in great inconvenience to suitors, which was sought to be remedied by one of the articles of Magna Charta, which declared that common pleas should no longer follow the king. Thenceforth justices were appointed expressly to hear and determine pleas of land, and injuries merely civil, which were known as "common pleas." This branch of the king's court was fixed at Westminster, and dates the origin of the court of common pleas.[13]

Perhaps the oldest of all courts emanating from the curia or aula regis was the exchequer. This was a board or court established by William the Conqueror to superintend and manage the royal revenues. To this board or court were added the chief justiciary, and the chancellor, and such barons and dignitaries of the church as the king selected for the purpose, who attended to judge the law and determine all matters of doubt. At first the jurisdiction of this court was confined to the decision of causes connected with the revenues, but its authority was subsequently enlarged by the use of a legal fiction, the plaintiff being permitted to allege that he was a debtor to the crown, and the aid of the court was invoked to enable him to recover from the defendant what would enable him to pay his debt to the crown.[14] In this way, to a certain extent, the jurisdiction of the court of exchequer became concurrent with that of the other superior law courts.

### The Court of Chancery

The court of chancery, in the exercise of its ordinary or common-law jurisdiction, is of very high antiquity. When the aula regis, or king's court, was broken into pieces, and its jurisdiction dstributed among the several courts as above designated, the court of chancery received its portion. But at that time it is apparent that the court of chancery did not exist as a court of equity as distinguished from a court of law.[15] Under the early Norman kings there existed a select council, always in attendance on the king's person corresponding to what is now termed the "privy council." This select council consisted of certain great officers, who were members ex officio,—as the chancellor, treasurer, grand justiciary, and justices of the other courts, and such others, usually barons, earls, and bishops, as the king might name. In early times—prob-

[13] Spence, Eq. Jur. pp. 113, 114.

[14] Spence, Eq. Jur. pp. 102, 114.

[15] Story, Eq. § 39, where it is said that among the earliest writers of the common law, such as Bracton, Glanvil, Britton, and Fleta, there is not a syllable to be found relating to the equitable jurisdiction of the court of chancery.

Digitized by Google

judicial business made easier this assumption.[19]  The exercise of judicial functions by the king, the select or privy council, and the great council or parliament makes clear the fact that the common-law courts were insufficient, even in their infancy, for the needs of the country, and that there were civil rights which such courts could not protect.

The earliest general reference to petitions to the chancellor is found in an ordinance of 8 Edw. I, in the year 1280, complaining of the multitude of petitions presented to the king which could properly be dealt with by the chancellor and judges, and providing that all petitions that touch the seal shall go first to the chancellor, and those relating to other subjects shall go to the exchequer, the justices, and other tribunals, according to their nature.[20]  It thus appears that during the reign of Edward I it was not yet a fixed practice to send to the chancellor all petitions coming before the king or his councils which could not, in the first instance, go to the common-law courts.  But the practice of delegating cases coming within the prerogative judicial jurisdiction of the crown and its councils to the chancellor for his sole decision, having once commenced, rapidly grew until it became the common method of dealing with such controversies.

In the reign of Edward III the court of chancery, as a court of ordinary jurisdiction, became of great importance.  But the chancellor, in the exercise of his common-law or ordinary jurisdiction, could not advert to matters of conscience.  It would, nevertheless, seem that it was during this reign that the court of chancery first existed as a distinct court for giving relief in cases which required extraordinary remedies.  Edward III was a busy king, engaged in numerous foreign enterprises, and therefore unable to attend to the many petitions which were presented to him; consequently, in the twenty-second year of his reign, he, by a writ or ordinance, referred all matters as were of grace to be dispatched by the chancellor, or the keeper of the privy seal.  It is generally considered that the court of chancery owes its existence as a regular court for administering extraordinary relief and equitable

[19] It is probable that the judicial power of the chancellor as a law judge, and his consequent familiarity with the laws of the realm, and experience in adjudicating, were the reasons why any case which appealed to the king's judicial prerogative, and which for any cause could not be properly examined by the council, was naturally referred either by the crown or the council to the chancellor for his sole decision.  Whatever may have been the motives, it is certain that the chancellor's equitable jurisdiction commenced in this manner. Pom. Eq. Jur. § 33.

[20] Hardy, Introduction to Close Rolls, p. 28; 2 Stubbs, Const. Hist. Eng. p. 263.

Digitized by Google

Case 3:23-cv-00121-SLG     Document 150-1     Filed 05/19/26     Page 17 of 28

remedies to this or a similar ordinance.[21] It does not appear, however, that matters of grace, involving equitable relief and remedies, were, at this time, exclusively sent to the chancellor. The great council, or parliament, and the privy council, still exercised an equitable jurisdiction by delegation from the sovereign. From this time suits were brought before the chancellor by petition or bill, without any preliminary writ. If, on the presentation of such petition or bill, the case called for extraordinary interference, a writ was issued on the command of the chancellor, but in the name of the king, by which the party complained against was summoned to appear before the court of chancery to answer the complaint and abide by the order of the court.[22] In the reign of Edward III the court of chancery ceased to follow the king.[23]

It was during the reign of Richard II that the court of chancery was established as a distinct and permanent court, having a sep-

[21] Spence, Eq. Jur. p. 337. Story quotes Wooddeson as deducing the jurisdiction from the same source, laying great stress on the ordinance above referred to, and also on the statute of 36 Edw. III (Stat. I, c. 9), which he considers as referring many things to the sole and exclusive cognizance of the chancellor. And he adds that it seems incontrovertible that the chancery exercised an equitable jurisdiction, though its practice was, perhaps, not very flourishing or frequent, throughout the reign of Edward III. Story, Eq. (13th Ed.) § 45. S. Newham Davis says (Origin and Nature of Equity, 2 Jurist, 26): "In 1348, by the writ of 22 Edw. III, it was enacted that all matters of grace and favor were to be referred to the chancellor, and to be dispatched either by him or the keeper of the privy seal. This was the great step which recognized the equitable, as opposed to the legal, jurisdiction of the court of chancery, although the distinction was not finally established until the following reign. From this date the chancellor possessed an independent as well as separate jurisdiction." The ordinance or proclamation above referred to ran as follows: "The King to the Sheriffs of London—Greeting: For as much as we are greatly and daily busied in various affairs concerning us and the state of our realm of England, we will that whatsoever business, relating as well to the common law of our kingdom as our special grace, cognizable before us, from henceforth be prosecuted as followeth, viz.: The common-law business, before the Archbishop of Canterbury elect, our chancellor, by him to be dispatched; and the other matters, grantable by our special grace, be prosecuted before our said chancellor or our well beloved clerk, the keeper of the privy seal, so that they, or one of them, transmit to us such petitions of business which without consulting us they cannot determine, together with their advice thereupon, without any further prosecution to be had before us for the same; that upon inspection thereof we may further signify to the aforesaid chancellor or keeper our will and pleasure therein; and, that none other do for the future pursue such kind of business before us, we command you immediately upon sight hereof to make proclamation of the premises." 1 Story, Eq. Jur. (13th Ed.) 44, note.

[22] Spence, Eq. Jur. p. 338.

[23] Spence, Eq. Jur. p. 340; Parke, Hist. Court of Chancery, p. 34.

Digitized by Google

essity in the actual administration of justice and from the deficien-
cies of the positive law (the lex scripta), or from the inadequacy of
the remedies, in the prescribed forms, to meet the full exigency of
each particular case. It was not a usurpation for the purpose of
acquiring and exercising power, but a beneficial interposition to
correct gross injustice, and to redress aggravated and intolerable
grievances.[28]

The inability or failure of the common-law judges to adopt and
apply the equitable principles contained in the Roman law add-
ed materially to the inflexibility of the common law, and aided
in the growth of the equitable jurisdiction of the court of chan-
cery. The Roman law was a growth in keeping with the needs
of society, and contained a notion of equity sufficient, if applied
to the administration of justice by common-law courts, to have
made the development of the equitable jurisdiction of the court
of chancery exceedingly difficult. This would have been especially
so had the common-law judges availed themselves of the example
set by the Roman prætors, and invented new actions and defenses
to meet the exigencies of an advancing civilization. But in the
early stages of the development of English equity, Roman law
was not easily applied to the tenure of real property, and the sta-
tus of persons, which were feudal in their origin and nature. There
was nothing in common between the institutions of feudalism as
they existed under the Norman kings and the doctrines of the
Roman law. As long as these institutions continued, none of the
doctrines of the Roman law could be effectively or advantageously
applied to them. Moreover, the possible growth of the Roman
law early received a lasting check. In the reign of Edward III
the exactions of the court of Rome had become odious to the king
and the people. The king, having the support of his parliament,
refused payment of the tribute which had been demanded by the
pope, and measures were taken to prevent further encroachments
of the papal power.[29] A general dislike on the part of the laity
to anything connected with the Holy See began to spring up. The
very name of Roman law became the object of aversion. In the
reign of Richard II the barons formally protested that they would
not allow the kingdom to be governed by the Roman law, and
the common-law judges prohibited it from being any longer cited
in their courts. The immediate effect of this was not to banish
the Roman law, but to transfer it to another tribunal, which was
not governed by common-law doctrines. The jurisdiction of the
court of chancery was greatly extended, and at once embraced

---

[28] Story, Eq. Jur. (13th Ed.) § 50.   [29] Spence, Eq. Jur. p. 346.

Digitized by Google

# A HISTORY
# OF ENGLISH LAW

BY

## W. S. HOLDSWORTH, K.C., D.C.L.

OF LINCOLN'S INN; VINERIAN PROFESSOR OF ENGLISH LAW IN THE UNIVERSITY OF
OXFORD; LATE FELLOW OF ST. JOHN'S COLLEGE, OXFORD; FOREIGN
ASSOCIATE OF THE ROYAL BELGIAN ACADEMY

## VOLUME I

THIRD EDITION, REWRITTEN

*To say truth, although it is not necessary for counsel to know what the history of a point is, but to know how it now stands resolved, yet it is a wonderful accomplishment, and, without it, a lawyer cannot be accounted learned in the law.* ROGER NORTH

METHUEN & CO., LTD.
36 ESSEX STREET W.C.
LONDON

Digitized by Google

the full effect was given to this clause,[1] before a century had elapsed[2] means were found to evade its operation. Of the technical methods by which this result was secured I shall speak more at length in a subsequent volume.[3]

The thirty-ninth clause is perhaps the most famous clause of the Charter. It provides that, " No freeman shall be taken or/ and imprisoned, or disseised, or exiled, or in any way destroyed, nor will we go upon him nor will we send upon him, except by the lawful judgment of his peers or/and by the law of the land."[4] Of the important constitutional doctrines that have been read into this clause, and of the large effects which this manner of interpreting it have had on English constitutional history, I shall speak later.[5] Here I shall only deal with it in relation to the judicial system, and attempt to ascertain the meaning which its framers attached to it.

Upon some points all the commentators are agreed. It is quite clear that the words "ibimus" and "mittemus" do not, as Coke supposed,[6] refer to legal process. As Mr. McKechnie says, they were aimed at the use of brute force.[7] It is also clear that the words "judicium parium" do not refer to trial by jury. A trial by a royal judge and a body of recognitors who found the facts was exactly what the barons did not want. What they did want was firstly a tribunal of the old type in which all the suitors were judges both of law and fact,[8] and secondly a tribunal in which they would not be judged by their inferiors.[9] Some of

[1] See the Eyre of Kent (S.S.) ii 86-87 for a case in which it was applied.

[2] Hengham, a judge of Edward I.'s reign (vol. ii c. 4) says in his tract called Magna c. 3, " Parvum seu nullum dominis curiarum in hujismodi placitis tenendis proficuum ascribitur."

[3] Vol. iii c. i § 1.

[4] " Nullus liber homo capiatur vel imprisonetur, aut disseisiatur aut utlagetur, aut exuletur, aut aliquo modo destruatur, nec super eum ibimus nec super eum mittemus, nisi per legale judicium parium vel per legum terræ."

[5] Vol. ii Bk. iii c. 2.

[6] " No man shall be condemned at the king's suit, either before the king in his bench, where the pleas are *coram rege* (and so are the words, *nec super eum ibimus*, to be understood) nor before any other commissioner or judge whatsoever, and so are the words, *nec super eum mittemus* to be understood," Second Instit. 46.

[7] Op. cit. 385-386; cf. the uses of these words collected by Harcourt, His Grace the Steward and Trial of Peers 243-244.

[8] P. and M. i 152 n. 2; Pike, House of Lords 169-170; McKechnie op. cit. 377-379; Harcourt, op. cit. chap. vii; Adams, Origin of the English Constitution 268-269; Select pleas in Manorial Courts (S.S.) lxv-lxvii; for the procedure in these courts see above 10, 11.

[9] McKechnie, op. cit. 377-379; Harcourt, op. cit. 205, 225-228; as Harcourt says, ibid at p. 225, " The term peer was at this period a very common word used to describe many different things ; it was by no means a technical word. . . . It was still primarily used to designate co-vassalship pure and simple without restriction as to rank or condition. Even the villein who purchased land was said by one writer to have for his peers the other tenants of the lord of his fee." Professor Pollard, Evolution of Parliament 91-92, apparently makes the "judicium parium" mean the doom or judgment of the peers—i.e. it refers not to a mode of trial, but to the

Digitized by Google

them did not consider that the royal judges,[1] none of them would have considered that a body of recognitors, were their peers.[2] It is in this respect that the clause is reactionary. But, like the thirty-fourth clause, it has only had a very limited and partial effect. We shall see that, when the term "peer" had acquired its modern technical meaning, it secured to "peers" accused of treason or felony the right, when Parliament is sitting, to be tried by the whole House of Lords, and the right when Parliament is not sitting to be tried by a jury of peers in the court of the Lord High Steward.[3] But we shall see also that even the trial before the whole House of Lords is not quite the same thing as the "judicium" which the framers of the Charter intended,[4] and that the trial in the court of the Lord High Steward is wholly different.[5]

The two chief points upon which the commentators are not agreed are firstly the meaning of the phrase "per legem terræ," and secondly the meaning of "vel" in the phrase "per judicium parium *vel* per legem terræ." To some extent these two points are connected, so that they can conveniently be considered together.

According to one view "lex terræ" refers, not to the law of the land, but to a trial by battle, ordeal, or compurgation.[6] The "lex" means the test by which the contentions of the parties were tried; and there is no doubt that the word is often used in this sense.[7] According to this view the barons ask for a trial before their peers who will adjudicate upon the "lex" to be adopted to decide the case. If we adopt this interpretation it is quite clear that the word "vel" must mean "and". The

resolution of the peers; but it is not likely that the framers of the Charter should have used this semi-technical phrase in this wholly new way.

[1] Adams, op. cit. 269-272; cf. the famous passage in the chronicle of Matthew Paris (R.S.) iii 251 where he relates that, in 1233, in answer to complaints that persons had been condemned without judgment of peers, "Petrus Wintoniensis episcopus dixit, quod non sunt pares in Anglia sicut in regno Francorum; unde licet regi Anglorum per justitiarios, quos constituerit quos libet de regno reos proscribere et mediante judicio condemnare;" this shows that the distinction between royal judges and peers was beginning to be perceived, Harcourt, op. cit. 277-278; it would certainly have been difficult to disprove the statement that the royal justices were entitled to judge—their courts had been regarded in the past as curiæ regis, above 35; and for a long time the amercements of peers which, by § 21 of Magna Carta must be assessed by peers, were, in accordance with this clause, assessed by the barons of the Exchequer, Bracton f. 116 b; Pike, House of Lords 254-258; McKechnie, op. cit. 297-298; for a similar controversy in France see Harcourt, op. cit. 272-274.

[2] P. and M. i 152 n. 2.      [3] Below 385-390.
[4] Pike, House of Lords, 174; below 389.      [5] Below 389-390.
[6] Selden, Notes on Fortescue De Laudibus c. 26; Bigelow, History of Procedure 155, n. 3; McKechnie, op. cit. 379; for a good summary of the discussion see McIlwain, Due Process of Law in Magna Carta Col. Law Rev. xiv 44-51.

[7] Adams, Origin of the English Constitutions 268; cf. instances Harcourt, op. cit. 232, n. 1 and 2; McIlwain, op. cit. 45.

Digitized by Google

Case 3:23-cv-00121-SLG     Document 150-1     Filed 05/19/26     Page 22 of 28

"judicium" and the "lex" are not alternatives : they are complementary to one another. It is quite clear also that the clause is wholly reactionary, and has no sort of constitutional significance.

According to the other view the term "lex terræ" means simply the law of the land;[1] and, here again, there is no doubt that the word "lex" often bears this meaning.[2] If this interpretation is correct, the barons are asking for a trial by peers, and that no violence be done to themselves or their possessions except, as Coke phrases it, "by due process of law;" and in that case, it would seem that the word "vel" may equally well be translated "and" or "or." The word is, as Maitland suggests, in much the same position as the $\frac{"and"}{or}$ of our mercantile documents.[3] It is also clear that this interpretation deprives the clause of some of its reactionary effect, and restores to it some of its constitutional significance. It is in substance a demand that no violence be offered to person or property without legal warrant.

It cannot be said that either view has been proved to be correct. In fact both interpretations are possible. On the whole I incline to the latter for the two following reasons.[4]

In the first place I think that it makes better sense. It would seem to be clear that there might be circumstances in which a man might lawfully be "taken or imprisoned or disseised or exiled" otherwise than by a judicium parium. As Mr. McIlwain has pointed out, he might be disseised as the result of a verdict in an assize of novel disseisin. Clearly that would be a disseisin lawfully effected but it would not be effected by a judicium parium.[5] Therefore unless we give to the phrase "per legem terræ" the meaning of "due process of law," we make

---

[1] Coke, Second Instit. 50, 51; Harcourt, op. cit. 228-233; Adams, op. cit. 262 seqq.; McIlwain, Col. Law. Rev. xiv 44-51.

[2] For a good collection of instances see Harcourt, op. cit. 229-231; a good instance of the use of the term "lex" in the two different senses in the same sentence is to be found in Glanvil xiv 2, " Non solet juxta legem terræ aliquis per legem apparentem se purgare," cited McIlwain, op. cit. xiv 46-47.

[3] P. and M. i 152 n. 2; I think that Harcourt is right when he says, " The Charter treats judgment of peers and the law of the land as to a great extent convertible terms. A large area was covered by both but their boundaries were by no means quite conterminous," op. cit. 223.

[4] This view is taken both by Professor Vinogradoff, Magna Carta Commemoration Essays, 83-85; and by Professor Powicke, ibid 98-107, whose reasons seem to me to be conclusive.

[5] Col. Law. Rev. xiv 48; as Professor Powicke says, Magna Carta Commemoration Essays 102, a contemporary change in Norman procedure illustrates clearly enough this distinction between judicium parium and lex terræ. Phillip Augustus took the trial of ducal pleas from the justices, and gave it to local men, i.e. he instituted a judicium parium; but " The procedure of the court and the law enforced by the court were not affected by the change; the lex terræ was observed both before and after; but henceforward a trial according to law would in Normandy involve a judicium parium. In England this was not necessarily the case."

Digitized by Google

Statute of Uses. That statute adopted the plan of abolishing in certain cases the dual ownership of the feoffees to uses and the cestui-que use, by taking from the feoffees to uses so much of their legal estate as was sufficient to give to the cestui-que use a legal estate corresponding to his equitable interest.[1] One result of the statute, therefore, was to give jurisdiction over the uses which had been thus turned into legal estates to the courts of common law. We shall see that for some time before 1535 the rivalry between the courts of common law and the court of Chancery had been growing acute;[2] and, on that account, the common lawyers assisted the passage of a statute which gave them jurisdiction at the expense of the court of Chancery.[3] But the statute did not apply to all uses. It did not, for instance, apply to cases where the feoffees were possessed of chattels real or personal to the use of others; nor did it apply to cases where they had active duties to perform, for instance if they were given land to the use that they should collect and pay the rents to a beneficiary.[4] Thus the court of Chancery still retained some of its jurisdiction; and it regained much of the jurisdiction of which the statute had deprived it in the latter half of the seventeenth century. The court of Wards and the courts of common law had decided in *Tyrrel's Case*[5] that if land was conveyed to A to the use of B to the use of C, the statute gave B the legal estate, and that the second use in favour of C was void; but after the Restoration the court of Chancery decided to enforce this second use as a trust.[6] Thus the old distinction between legal and equitable estates in conveyances of property to which the Statute of Uses applied was restored; and so, in another form, the court of Chancery recovered its old jurisdiction.

Secondly, the court of Chancery interfered to enforce contracts on principles very different from any known to the common lawyers. We shall see that in the earlier part of the mediæval period the courts of law had no adequate remedy for the enforcement of simple contracts. The action of covenant was only available if the contract was in writing and under seal; and the action of debt applied only to certain kinds of executed contract, and was for other reasons an unsatisfactory action.[7] Having no adequate remedy for the enforcement of contracts, the courts of common law developed no adequate theory of contract. They had not yet grasped the idea that the essence of contract is consent, and that consent ought, under certain circumstances, to give

---

[1] Vol. iv Bk. iv Pt. I. c. 2.
[2] Vol. iv Bk. iv Pt. I. c. 2.
[3] (1557) Dyer 155 a.
[7] Vol. ii Bk. iii c. 4; vol. iii c. 3.
[3] Below 459-460.
[4] Ibid.
[6] Bk. iv Pt. I. cc. 2, 4, 8.

Digitized by Google

rise to an actionable obligation. But the Chancellors had from the first approached the subject of contract from this point of view;[1] for the majority of the Chancellors were ecclesiastics; and breach of faith was a sin punishable by the ecclesiastical law.[2] It is true that the lay courts issued writs of prohibition if they caught the ecclesiastical courts attempting under this pretext to enforce contracts.[3] But the Chancellors carried with them into the court of Chancery the idea that faith should be kept; and enforced agreements, just as they enforced trusts, whenever they thought that in the interests of good faith and honest dealing, they ought to be enforced.[4] This might well have brought the whole of the law of contract under the jurisdiction of the court of Chancery, had not the common law courts awakened in time to the necessity of providing a remedy for the breach of simple contracts. Fortunately for the common law the rivalry between the common law courts and the court of Chancery roused the judges of those courts to action before it was too late. From the middle of the fourteenth century onwards, they so developed a form of the action of trespass on the case, called the action of assumpsit,[5] that it became an adequate remedy for the breach of simple contracts;[6] and, in and through this action, the common law theory that simple contract is an agreement based upon consideration was developed.[7] This theory of contract proved to be so adequate that it was accepted by the court of Chancery, which, by the end of the sixteenth or the beginning of the seventeenth centuries, refused to enforce simple contracts made without consideration.[8] In consequence of this development the interference of equity was rendered less necessary; but it was not rendered wholly unnecessary. The only remedy which the common law courts could give was damages. If a plaintiff wanted specific relief he was obliged to come to the court of Chancery.[9] The equitable jurisdiction was therefore needed, not because of the inadequacy of the common law conception of contract, but because of the inadequacy of the common law remedy for breach of contract.

---

[1] Vol. v Bk. iv Pt. I. c. 4.    [2] L.Q.R. v 236; below 621.

[3] "Placita de debitis, quæ fide interposita debentur, vel absque interpositione fidei, sint in justitia regis," Constitutions of Clarendon § 15; vol. ii Bk. iii c. 4.

[4] Vol. v Bk. iv Pt. I. c. 4; cf. Diversite des Courtes cited Kerly, Equity 88; Y.B. 8 Ed. IV. Pasch. pl. 11.

[5] "Assumpsit" means literally "he has promised."

[6] Vol. iii c. 3.

[7] Ibid; Bk. iv Pt. II. c. 3 § 1.

[8] Vol. v Bk. iv Pt. I. c. 4; older cases to the contrary were overruled.

[9] In Y.B. 21 Hy. VII. Mich. pl. 66 Fineux, C.J., said that if one bargain that I shall have his land to me and my heirs for £20, and I pay, I may have action on the case, and need not sue out a subpœna; but to this Brook in his Abridgment adds the remark that "by this he will get nothing but damages, but by subpœna the Chancery can compel the defendant to convey the estate or imprison him, *ut dicitur.*"


Digitized by Google

# A HISTORY
# OF ENGLISH LAW

BY

## W. S. HOLDSWORTH, K.C., D.C.L.

VINERIAN PROFESSOR OF ENGLISH LAW IN THE UNIVERSITY OF OXFORD; FELLOW OF ALL SOULS
COLLEGE, OXFORD; LATE FELLOW OF ST. JOHN'S COLLEGE, OXFORD; FOREIGN ASSOCIATE
OF THE ROYAL BELGIAN ACADEMY; FELLOW OF THE BRITISH ACADEMY

## VOLUME III

THIRD EDITION, REWRITTEN

*To say truth, although it is not necessary for counsel to know what
the history of a point is, but to know how it now stands resolved, yet it is a
wonderful accomplishment, and, without it, a lawyer cannot be accounted
learned in the law.*　　　　　　　　　　　　　ROGER NORTH

**BOSTON**
LITTLE, BROWN, AND COMPANY
1923

Digitized by Google

action of debt on an executory contract.[1]  Just as that analogy had helped the lawyers to extend the sphere of assumpsit to remedy certain cases of non-feasances in breach of an undertaking,[2] so at a later period it helped them to extend its sphere to remedy the breach of executory contracts.  The "infinite precedents" which were shown to Coke to justify the decision of the court appear to have been cases of contracts of sale;[3] and the terms of the resolution show that it was the contract of sale that the judges had in their minds.

But, though these two developments which gave rise to Indebitatus Assumpsit, and to the extension of assumpsit to remedy purely executory contracts, were in their origin inter-dependent, these two varieties of assumpsit came in time to develop differences which made them distinct forms of action. Thus in 1696 it was held that, though assumpsit lay on an executory contract, Indebitatus Assumpsit only lay when Debt would lie, and could not therefore be brought on a purely ex-ecutory contract.[4]  Special or Express assumpsit thus becam-distinct from Indebitatus Assumpsit; and, as we shall see immedi-ately, both were distinct from the action in tort grounded on an assumpsit which had been their first parent.

(4) *The extension of the action to remedy the breach of implied contracts.*

The notion of an implied contract figures prominently in *Slade's Case;* and it was a notion which was badly needed to fill up a serious lacuna in the law.  The view held by the court of Common Pleas, that Indebitatus Assumpsit only lay when there had been an express subsequent promise to pay, had led to very serious hardship.  Thus in 1587, in *Young and Asburnham's Case*[5] it was held, in accordance with mediæval precedents,[6] that, when a man had lodged at an inn without agreeing upon a fixed price for his entertainment, the innkeeper could not bring Debt; and clearly, as no express promise to pay had been made, he could not bring Indebitatus Assumpsit.[7]  One of the effects of the decision in *Slade's Case* was to remedy this injustice.  In

[1] Above 423.                                          [2] Above 436-439.
[3] The first reason alleged for the decision was "in respect of infinite precedents (which George Kemp Esqr. Secondary of the Prothonotaries of the King's Bench, shewed me) . . . in the reigns of H. 6, E. 4, H. 7 and H. 8, by which it appears that the plaintiffs declared that the defendants, in consideration of a sale to them of certain goods, promised to pay so much money, etc., in which cases the plaintiffs had judgment," 4 Co. Rep. at ff. 93a, 93b.
[4] Bovey v. Castleman 1 Ld. Raym. 69.          [5] 3 Leo. 161.
[6] "Et Brian disoit que si jeo port un drape a un taylor de avoir un toge fait, si le price ne soit en certain devant combien jeo payera pur le fesans, il n'avera Det vers moy," Y.B. 12 Ed. IV. Pasch. pl. 22 (p. 9).
[7] Above 443.

Digitized by Google

1610 in the case of *Warbrooke v. Griffin* it was recognized that the innkeeper could sue for the value of the entertainment which he had provided;[1] and thus was introduced the idea that, when a promise to pay ean be implied, assumpsit can be brought on a quantum meruit.[2] This principle was soon accepted; and Shepherd in his book on Actions on the Case cites a case of the year 1632 for the general proposition that, "If one bid me do work for him, and do not promise anything for it; in that case the law implieth the promise, and I may sue for the wages."[3] This principle was easily extended in the course of the seventeenth century to tailors,[4] carriers,[5] factors or bailiffs,[6] vendors of goods,[7] and, in the eighteenth century, to actions by paying sureties against the principal debtor.[8] It was also extended to accounts stated,[9] and to the enforcement of an award by arbitrators ordering one of the parties to the arbitration to do a specific act.[10] In making these logical applications of the principle sanctioned in *Slade's Case* it is probable that the common law courts were influenced, as they had been influenced at earlier periods in the history of this branch of the law, by the fact that the court of Chancery gave a remedy in such cases.[11] In consequence of this action of the courts of common law the interference of equity became unnecessary; and Spence was somewhat at a loss to account for the suits brought to enforce " purely legal demands of a personal nature" which he found on the records of the court in the sixteenth century.[12] As Ames has pointed out the fact that assumpsit could not then be brought on a quantum meruit is a sufficient explanation.

It followed from these cases that assumpsit became a possible remedy in many cases which were formerly only remediable by Debt, Account, or an innominate action on the case. Thus we have seen that it lay on an account stated,[13] and against factors and bailiffs for the payment of ascertained sums of money due from them.[14] But it is the extension of one or other of the forms of assumpsit to some of these innominate actions on the case

---

[1] 2 Brownlow 254, S.C. Moore 876-877, cited Ames, Lectures 154 n. 4.
[2] Ibid 154.    [3] Cited ibid 154-155.
[4] See the Six Carpenters' Case (1611) 8 Co. Rep. at f. 147a; and cp. Ames, Lectures 154 n. 5.
[5] Nichols v. More (1661) 1 Sid. 36.    [6] Wilkin v. Wilkin (1691) 1 Salk. 9.
[7] Hayward v. Davenport (1697) Comb. 426 *per* Powell, J.
[8] See Ames, Lectures 155-156.    [9] Egles v. Vale (1606) Cro. Jac. 70.
[10] If the award was to pay a sum of money Debt lay; but there was no remedy at common law if the award was to do any other act, see Ames, Lectures 159, citing Tilford v. French (1663) 1 Lev. 113; but at the end of the seventeenth century Holt, C.J., allowed assumpsit to be brought in such a case, Freeman v. Bernard (1698) 1 Ld. Raym. at p. 248.
[11] Ames, Lectures 156.    [12] Equitable Jurisdiction i 693-694.
[13] Above n. 9.    [14] Above n. 6.

Digitized by Google

Case 3:23-cv-00121-SLG    Document 150-1    Filed 05/19/26    Page 28 of 28